[No. E039985. Fourth Dist., Div. Two. Mar. 19, 2007.]

THE PEOPLE, Plaintiff and Appellant, v.
CHANSAK PLENGSANGTIP, Defendant and Respondent.

COUNSEL

Michael A. Ramos, District Attorney, and Mark A. Vos, Lead Deputy District Attorney, for Plaintiff and Appellant.

David Michael Lumb; and Joseph F. Walsh for Defendant and Respondent.

OPINION

KING, J.—

## I. INTRODUCTION

Following a preliminary hearing, defendant was held to answer on a single charge of being an accessory after the fact to the November 23, 1996, murder of Luis Garcia (Garcia). (Pen. Code, § 32.)[1] The charge was based in part on statements defendant made to police in a February 3, 2004, interview. The superior court granted defendant's motion to set aside the information under section 995. The People appeal, on the grounds the court misapplied the law concerning accessories and failed to defer to the magistrate's factual findings at the preliminary hearing. We conclude that the evidence adduced at the preliminary hearing was sufficient to support the accessory charge. Accordingly, we reverse the order setting aside the information.

## II. FACTS AND PROCEDURAL HISTORY

### A. *Background*

In August 2004, a complaint was filed charging defendant with being an accessory after the fact to the 1996 murder of Garcia. (§ 32.) The complaint

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

alleged that on November 23, 1996, Woravit Mektrakarn, also known as Kim Mektrakarn (Kim), murdered Garcia, and on the same date, defendant, with knowledge of the murder, "did harbor, conceal, and aid said Woravit Mektrakarn, with the intent that he . . . might avoid and escape from arrest, trial, conviction, and punishment for said felony."[2] A warrant was issued for defendant's arrest, and defendant pleaded not guilty.

### B. *The Evidence at the Preliminary Hearing*

The evidence at the October 2005 preliminary hearing included the testimony of 12 witnesses presented over a two-day period.

#### 1. *Background*

In 1996, Kim and his wife, Aree Mektrakarn (Aree), both Thai nationals, owned and operated a food processing company in Ontario, California known as Rama Foods. Some of the employees of the business typically worked 12-hour days, six days per week. They were paid the minimum wage or a slightly higher wage, but no overtime.

By late 1996, Garcia, then 23 years old, had been working at Rama Foods for two years. Garcia was from Veracruz, Mexico. His cousin, Rene Delgado (Rene), had been working at the plant for 10 years. Rene acted as a chauffeur, mechanic, translator, and liaison between the Mektrakarns and the plant workers. Rene testified that, in October 1996, he was present when Garcia threatened to report the Mektrakarns to the "labor commission" for failing to pay overtime, unless they paid Garcia $5,000. The Mektrakarns agreed to pay Garcia $5,000 in three installments, and paid him $1,000 right away and in Rene's presence. Garcia was supposed to keep quiet about the deal, but before Garcia received another payment, fellow worker Epifanio Flores found out and also wanted money.

Garcia's friend, Guillermo Ramirez (Ramirez), testified that Garcia was going to Rama Foods to pick up at least $3,000 on November 23, 1996. Garcia and Ramirez were planning to go out to dinner that evening after Garcia returned to Ramirez's apartment with the money, but Garcia never

---

[2] Following the presentation of evidence at the preliminary hearing, defendant moved to dismiss the complaint on statute of limitations grounds. He argued that the limitations period for a section 32 violation is three years (§ 801); thus, the prosecution was untimely commenced (§ 804).

Magistrate Barry Plotkin allowed the prosecution to amend the complaint to allege that defendant committed the accessory crime on February 3, 2004, the date defendant was interviewed by police. The magistrate found that the amendment did not prejudice defendant because his counsel had prepared for and argued the issues raised by the amendment. Thereafter, the court held defendant to answer on the charge as amended.

returned. Another cousin of Garcia's, Francisco Delgado (Francisco), also worked at the plant. Francisco also knew that Garcia was supposed to receive money from Kim on November 23. Garcia was not seen or heard from after November 23. He had a plane ticket to fly to Veracruz, Mexico on December 8, 1996, to visit relatives, but he never made the trip.

According to Rene, Kim and defendant were friends. And according to Francisco, it was not unusual for defendant to visit Rama Foods; Francisco would see defendant at the company plant in Ontario approximately once a month. In 1996, defendant owned and operated a business, Lanna Trading, in Los Angeles. Defendant is also a Thai national.

2. *The Events of November 23, 1996*

On Saturday, November 23, 1996, Francisco arrived at the Rama Foods plant at 7:00 a.m. Sometime that morning, he drove Kim to Ontario International Airport to rent a Plymouth Voyager minivan. According to Francisco, Kim returned to the plant in the rented minivan "around 5:00 in the afternoon." Rene arrived at the plant at 8:00 a.m., and saw Kim there at 3:00 p.m. At that time, Kim's usual car, a Honda Passport, was in the parking lot. At 4:00 p.m., Kim told Rene he was expecting Garcia to arrive.

The Rama Foods office area was approximately 45 feet long by 20 feet wide. It was situated inside the northwest corner of the plant. There were three separate offices: the north, middle, and south offices. The north office had a door leading outside to the parking lot. The north office also had a door leading east to an adjacent storage room, which in turn had an access door to the plant area. The only other door allowing access to the office area from the plant, and vice versa, was a door in the south office wall.

Francisco recalled seeing defendant arrive at Rama Foods around 4:00 p.m. on November 23. Francisco saw defendant park his car, a brown or tan Mercedes-Benz, in the parking lot and walk toward the offices. According to Ramirez, Garcia left Ramirez's apartment in Fontana for Rama Foods between 3:00 and 4:00 p.m. The apartment was a 20-minute drive away. Rene saw Garcia at the plant at 5:00 p.m. Francisco and another employee, Julio Zamudio (Zamudio), saw Garcia arrive at 5:00 p.m. According to Francisco, Garcia arrived in his own car and walked toward the office area. Garcia's car was there until about 5:30 p.m. Zamudio saw Garcia enter the plant area through one of the rollup doors and walk toward the office area.

At 5:00 p.m., Aree called Rene into the plant's north office to translate for Garcia. According to Rene, there were five people in the office other than

himself: defendant, Garcia, Kim, Aree, and Kim's sister Vicky.[3] Kim and Aree told Rene they were going to pay Garcia the rest of the money. Rene did not witness the payment, however. Aree told Rene to go clean the area in the back of the plant, and Rene left the office with Aree. Rene thought Aree's request was strange, because cleaning was not a part of his normal duties. He wanted to return to the office, but Aree would not allow him back in the office.

Rene did not complete the cleaning assignment. Instead, he left for home at 5:30 p.m. As he did so, he drove by the outside door to the north office and looked through the window. Inside the office, he saw three men, at least two of whom appeared to be hiding or crouching. At this time, Garcia's, Kim's, and defendant's cars were still in the parking lot, but Kim's rented minivan was no longer there. Earlier, when Rene was in the office, he saw two large metal pots, handcuffs, and a hand-held radio. The metal pots were clean.

Francisco's usual duties included moving everyone's cars inside the plant near the end of the day. Between 6:00 and 6:30 p.m., he tried to enter the office area to retrieve car keys to move the cars and park them inside the plant, but Aree did not allow him in the office area. This was the first time Francisco had not been allowed to move the cars inside the plant. Francisco left the plant at 7:00 p.m. At that time, he noticed that defendant's car was still in the parking lot.

During the afternoon, Kim ordered Zamudio to stack pallets in front of the south office door. This prevented access to the offices from the plant area. Zamudio used a forklift to begin stacking the pallets, and Kim completed the task. The stack was heavy and as high as the top of the office door. The task was completed before Zamudio saw Garcia arrive at 5:00 p.m. During the 14 years Zamudio worked at the plant, he had never seen a stack of pallets blocking the office door. Zamudio also testified that his coworker Adolfo was not allowed to count his sales route money inside the office that afternoon, as Adolfo usually did.

### 3. *The 1996 Investigation*

By Monday, November 25, 1996, a homicide investigation was underway. When Francisco arrived at work that morning, he entered the plant through the office area and noticed that the carpet was "cut up and dirty." It looked as though some liquid had been spilled on it. It did not look that way when he last saw it on Saturday morning, November 23.

---

[3] Rene did not initially tell police that defendant was present in the office. In 1996, Ontario Police Detective Jay Hadley interviewed Rene concerning the office meeting involving Garcia. On that occasion, Rene told Detective Hadley that only Kim and Garcia were in the office and that Aree escorted Rene out of the office.

Forensic supervisor Steve Hall (Hall) arrived at the Rama Foods crime scene at 10:15 p.m., and joined the investigation. When Hall arrived, Kim was present and had injuries on both his hands.

Hall testified about several items the police found in a Dumpster 50 feet from the office area. These included: (1) a large metal pot wrapped in two plastic bags. There was ash inside the pot, and it looked as though someone tried to burn evidence in it; (2) a plastic bucket with burned carpet inside; (3) three pieces of carpet that had been fused together by burning; (4) a small, triangular piece of carpet that matched a triangular hole found in the south office carpeting; (5) a can of lighter fluid with about one inch of liquid inside; (6) a pair of blue jeans stained white by bleach and with cleaning fluid on them; (7) a yellow glove and pink velvet soap material, the same sort of fluid found on the rug in the north office; and (8) an original fax cover sheet with defendant's "Lanna Trading" letterhead.

The following items tested positive for the presence of blood or blood-stains: (1) a piece of "rug" from the north office; (2) carpet in the office hallway along the west wall; (3) carpet next to the triangular-shaped hole in the south office; and (4) the area inside the office bathroom sink trap. Two handguns were also found at the scene.

The Plymouth Voyager minivan Kim had rented was found in the parking garage of the Rio Hotel in Las Vegas on December 15, 1996. National Rent-A-Car had reported it stolen. It was missing its license plates and smelled of bleach. Apparently, bleach had been poured on the floor of the van, including in the rear. Otherwise, the van was very clean. It was locked, its ignition had not been punched out, and it did not appear to have been broken into. On December 4, 1996, Garcia's car was found in Los Angeles with its key in the ignition.

The record is silent concerning what occurred following the 1996 investigation. Apparently, Garcia's body was never found, and Kim fled to Thailand. It is also unclear whether Kim, his wife Aree, his sister Vicky, or anyone other than defendant has ever been charged with any crimes as a result of the 1996 investigation.

4. *The 2004 Investigation*

In early 2004, Garcia's nail clippings were compared with blood samples from Garcia's parents. DNA testing showed that the blood found on the office carpet samples collected in 1996 belonged to Garcia.

On February 3, 2004, Ontario Police Detective Byron Lee interviewed defendant at the Ontario police station. The interview lasted approximately

one hour and was recorded. Detective Lee told defendant he was investigating the murder of Garcia, a worker who was missing from Rama Foods in Ontario, and Kim's possible involvement in the murder.

During the interview, defendant told Detective Lee the following: (1) he closed his business at 4:00 or 5:00 p.m. on November 23, 1996, and drove to Ontario; (2) he arrived at Rama Foods at 6:00 p.m., when it was just beginning to get dark. (Sunset that day was 4:45 p.m. through 5:15 p.m.); (3) he was at Rama Foods for two to three hours; (4) he saw Kim, Vicky, and Rene at the Rama Foods office; (5) at some point during his stay, he was in "all areas" of Kim's rented minivan; (6) he never saw Garcia that day or ever; (7) Kim was going in and out of the office area, conducting business as usual; (8) he did not see Kim murder Garcia, nor did he see or hear anything unusual in the office area; (9) he was "shocked" that Kim would be involved in a murder, because Kim "was a good boy"; (10) he went to Thailand just after November 23, 1996; and (11) when he returned from Thailand, he found that police had spoken with his wife, but he did not contact police because they did not leave a phone number. Defendant did not say that Kim could not have committed the murder because Kim was in his presence the entire time he was at Rama Foods.

On February 26, 2004, Detective Lee and crime scene specialist David Johnson returned to Rama Foods, where Johnson performed "fluorescein blood tests" in the office area. The tests revealed the presence of blood in the north office (where Rene saw Kim, Aree, Vicky, defendant, and Garcia during the afternoon of Nov. 23, 1996), on the wall near the door to the north office, and on the door to the north office. There was a "medium velocity" blood spatter, indicating the victim was leaning against the wall when attacked. Blood was also detected in the hallway leading away from the north office, indicating that the victim's body rubbed against the wall as it was dragged down the hallway. Blood was also detected all over the bathroom. There was "cast-off" blood on the wall and wallboard in the bathroom, and blood spatter on the bathroom ceiling. This indicated the victim was attacked a second time in the bathroom. Johnson also detected blood in the south office. The blood spatter evidence found on the walls in 2004 corresponded to the bloodstained carpeting and carpet cuts that were found in 1996.

### 5. *Additional Testimony*

Wonpen Lee (Wonpen) was married to defendant on November 23, 1996, but was no longer married to him at the time of the preliminary hearing in October 2005. On November 23, defendant told Wonpen he was going to see Kim that evening and the two of them were going to drive to Las Vegas. Wonpen knew that defendant usually closed his business at 4:00 p.m. on

Saturdays, but she did not know whether he closed at 4:00 p.m. that Saturday or what time he left Los Angeles for Ontario. Defendant did not have any business with Kim at the time of the murder. Defendant returned home at 9:00 p.m. on Saturday, November 23. He told Wonpen he did not go to Las Vegas because the Mektrakarns had a marital quarrel.

Defendant went to Thailand "toward the end of 1996." He visited his mother in Bangkok, who had been ill for a long time, and a friend in Phuket with whom he might do business. He was away for two months. He told Wonpen it was good that he leave the country so he could avoid getting tangled up in Kim's problems, and that Kim told him if anyone asked whether he went to Las Vegas on November 23, he should lie and tell them he went there.

Detective Lee testified that he believed defendant's February 3, 2004, statements constituted a false alibi for Kim and false evidence of Kim's innocence. In essence, defendant told Detective Lee he neither saw nor heard anything unusual in the Rama Foods office area during the few hours he was there. Detective Lee admitted he did not know when the blood spatter evidence that was discovered in 2004 got there. But he also noted that blood was found on the carpet on November 25, 1996, and DNA testing identified that blood as Garcia's. Detective Lee believed Garcia was murdered between 5:00 and 5:30 p.m. on November 23, 1996, and that defendant must have lied when he said he saw nothing unusual at Rama Foods while he was there. Detective Lee said it was *possible*, but highly unlikely, that Garcia left the offices on November 23, but returned and was attacked in the office on Sunday, November 24.

### 6. *The Magistrate's Findings*

Based on the evidence presented at the preliminary hearing, the magistrate made the following findings of fact: (1) it was "abundantly clear" Kim murdered Garcia; (2) Kim lured Garcia to Rama Foods, using a false promise to pay him to prevent his reporting Kim's labor law violations; (3) Garcia arrived at Rama Foods at 5:00 p.m. on November 23, 1996, and never left there alive; (4) defendant arrived at the offices around the same time Garcia arrived, and defendant's car was there until at least 7:30 p.m.; (5) defendant was seen in the office with Kim and Garcia before Garcia was murdered; (6) it would be "inconceivable" for defendant not to have been aware of the violent assault perpetrated on Garcia; and (7) defendant's explanation to his then wife Wonpen that he and Kim did not go to Las Vegas because the Mektrakarns had a marital argument was discredited in view of the murder that had taken place.

The magistrate further found that, when defendant was interviewed by Detective Lee on February 3, 2004: (1) Defendant knew Detective Lee was investigating the murder of Garcia and that Kim was the principal suspect; (2) defendant "affirmatively misrepresented" to Detective Lee that he did not see Garcia at Rama Foods and that he never saw any type of assault while he was there; and (3) the totality of defendant's false statements, coupled with his vouching for Kim's good character and his assurances to Detective Lee that Kim would "not find himself involved in such heinous behavior," constituted the type of affirmative representations that the court in *People v. Duty* (1969) 269 Cal.App.2d 97 [74 Cal.Rptr. 606] (*Duty*) classified as committing the crime of accessory. Finally, the magistrate found that, even if defendant's motive to lie to Detective Lee included exculpating himself, there was probable cause to believe that defendant lied for the dual motive of shielding Kim.

C. *The Section 995 Motion*

In October 2005, an information was filed charging defendant with one count of committing accessory to murder, on or about February 3, 2004. Defendant moved to set aside the information pursuant to section 995, and the superior court granted the motion. The court explained it had researched the law concerning accessories, including the laws of other states, and its research led it to conclude that "the fact that . . . a witness falsely denies having knowledge of the crime or that a person was involved in the commission of the crime will not in itself render such witness an accomplice or an accessory after the fact."

The court further explained: "Here we have a situation where it's alleged by the prosecution that the defendant falsely—during an interview process 8 years after the alleged commission of the crime . . . denied any involvement or knowledge of the crime occurring in an area where he would have been during the alleged commission of the crime. I think that alone is not an affirmative statement that aids or harbors or conceals or prevents the prosecution of another defendant within the meaning of [section] 32 of the Penal Code, and I believe there's an insufficiency of evidence to establish that the defendant was actually an accessory of the crime, so the [section] 995 motion is granted and the case is dismissed." This appeal followed.

III. DISCUSSION

The People contend the trial court erred in granting the section 995 motion. They argue that the trial court misapplied the applicable law concerning accessories and failed to properly defer to the magistrate's factual findings. For the reasons set forth below, we agree with the People.

## A. Standard of Review

" '[T]he purpose of a preliminary hearing is, in part, to assure that a person is not detained for a crime that was never committed . . . .' " (*Rayyis v. Superior Court* (2005) 133 Cal.App.4th 138, 149 [35 Cal.Rptr.3d 12].) Preliminary hearings are " 'designed to weed out groundless or unsupported charges of grave offenses and to relieve the accused of the degradation and expense of a criminal trial.' " (*People v. Superior Court (Mendella)* (1983) 33 Cal.3d 754, 759 [191 Cal.Rptr. 1, 661 P.2d 1081].) Preliminary hearings *and* section 995 motions "operate as a judicial check on the exercise of prosecutorial discretion" and help ensure " 'that the defendant [is] not . . . charged excessively.' " (*People v. Superior Court (Mendella)*, *supra*, at p. 759; accord, *People v. Herrera* (2006) 136 Cal.App.4th 1191, 1202 [39 Cal.Rptr.3d 578].)

Section 995 provides that an information "shall be set aside" if the defendant has been "committed without reasonable or probable cause." " ' "Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused." ' [Citations.]" (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].) Neither the superior court ruling on a section 995 motion nor the appellate court reviewing the superior court's order may substitute its judgment for that of the committing magistrate concerning the weight of the evidence or the credibility of the witnesses. (*People v. Block* (1971) 6 Cal.3d 239, 245 [103 Cal.Rptr. 281, 499 P.2d 961]; *People v. Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664].)

Thus, "[a]n information [must] not be set aside or a prosecution thereon prohibited if there is *some rational ground* for assuming the possibility that an offense has been committed and the accused is guilty of it." (*Rideout v. Superior Court, supra*, 67 Cal.2d at p. 474, italics added.) Conversely, an information *will* be set aside "only when there is a total absence of evidence to support a necessary element of the offense charged." (*People v. Superior Court (Jurado)* (1992) 4 Cal.App.4th 1217, 1226 [6 Cal.Rptr.2d 242].) The evidence supporting each element of the charged crime "may be made by means of circumstantial evidence supportive of reasonable inferences on the part of the magistrate." (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1148 [80 Cal.Rptr. 747, 458 P.2d 987].) "Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." (*Rideout v. Superior Court, supra*, at p. 474.)

## B. The Elements of Accessory (§ 32)

Section 32 defines the crime of "accessory" as follows: "Every person who, after a felony has been committed, harbors, conceals or aids a principal

in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

The crime of accessory consists of the following elements: (1) someone other than the accused, that is, a principal, must have committed a specific, completed felony; (2) the accused must have harbored, concealed, or aided the principal; (3) with knowledge that the principal committed the felony or has been charged or convicted of the felony; and (4) with the intent that the principal avoid or escape from arrest, trial, conviction, or punishment. (*Duty, supra,* 269 Cal.App.2d at pp. 100–101; *People v. Prado* (1977) 67 Cal.App.3d 267, 271 [136 Cal.Rptr. 521].)

## C. *Accessory Based on False Statements*

■ It is clear that certain lies or "affirmative falsehoods" to authorities, when made with the requisite knowledge and intent, will constitute the aid or concealment contemplated by section 32. For example, in *Duty, supra,* 269 Cal.App.2d at pages 101 through 104, the court upheld the defendant's conviction for being an accessory to a principal's crime of arson, based on the defendant's false statements to authorities that the principal was with him and nowhere near the vicinity of the crime when it was committed. The defendant thus provided a "false alibi" for the principal, knowing she was a suspect in the arson and with the specific intent that she avoid prosecution for the crime.

Similarly, in *In re I. M.* (2005) 125 Cal.App.4th 1195, 1203–1205 [23 Cal.Rptr.3d 375], the defendant's accessory conviction was upheld based on his false statements to police suggesting that the principal shot a victim in self-defense or in the heat of passion. The evidence showed the defendant made the false statements, knowing the principal was the shooter and with the intent that the principal avoid or escape prosecution for being the aggressor in the shooting. It was not necessary that the defendant's lies or attempt to aid the principal were successful; the evidence that he intended to aid the principal by lying was enough.

In contrast to affirmative falsehoods, the mere passive failure to reveal a crime, the refusal to give information, or the denial of knowledge motivated by self-interest does not constitute the crime of accessory. Thus, in *People v. Nguyen* (1993) 21 Cal.App.4th 518, 527, 537–539 [26 Cal.Rptr.2d 323], the court reversed three defendants' convictions for being accessories to a crime of sexual assault. The sexual assault was committed during the course of a robbery in which the three defendants and several of their cohorts participated. The sexual assault was not committed as a means of perpetrating the

robbery, however, and the three defendants did not participate in the sexual assault. The evidence showed only that the three defendants were *aware* that their cohorts in the robbery were committing the sexual assault, but there was no evidence that any of them said or did anything to help their cohorts avoid or escape arrest, trial, conviction, or punishment for the sexual assault. Indeed, two of the defendants simply refused to talk to the police about the crimes, and the third merely admitted he was present at the scene of the robbery and downplayed his role, saying he was given cash and jewelry to hold. Thus, there was insufficient evidence to support the accessory convictions.

As the court in *Duty* explained, "[T]he offense [of accessory] is not committed by *passive* failure to reveal a known felony, by *refusal* to give information to authorities, or by a *denial of knowledge motivated by self-interest*. On the other hand, an affirmative falsehood to the public investigator, when made with the intent to shield the perpetrator of the crime, may form the aid or concealment denounced by [section 32]." (*Duty, supra,* 269 Cal.App.2d at pp. 103–104, fns. omitted, italics added.) Thus, a person generally does not have an obligation to volunteer information to police or to speak with police about a crime. If the person speaks, however, he or she may not affirmatively misrepresent facts concerning the crime, with knowledge the principal committed the crime and with the intent that the principal avoid or escape from arrest, trial, conviction, or punishment. (*Id.* at pp. 103–104; see also *Crayton v Superior Court* (1985) 165 Cal.App.3d 443, 451 [211 Cal.Rptr. 605].) Furthermore, in determining whether a defendant had the requisite knowledge and intent to commit the crime of accessory, the jury may consider "such factors as [the defendant's] possible presence at the crime or other means of knowledge of its commission, as well as his companionship and relationship with the principal before and after the offense." (*Duty, supra,* at p. 104.)

D. *Analysis and Conclusions*

The question here is whether the evidence presented at the preliminary hearing was sufficient to support the magistrate's finding that there was reasonable or probable cause to believe defendant committed the crime of accessory to the murder of Garcia, when, on February 3, 2004, he told Detective Lee he did not see a murder take place nor did he see or hear "anything unusual" happen on November 23, 1996, when he was in and around the office area at Rama Foods. For the reasons that follow, we believe the evidence was sufficient to support the four elements of the accessory charge.

First, the testimony and the physical evidence support the magistrate's findings that Kim murdered Garcia in the Rama Foods office area on

November 23, 1996; that defendant was in the office area with Kim and Garcia before the murder took place; that the murder was committed *while* defendant was present at Rama Foods; and that it was "inconceivable" that defendant was unaware of the assault on Garcia. Based on these findings, the magistrate reasonably concluded that defendant told an affirmative falsehood when, on February 3, 2004, he told Detective Lee he did not see Garcia in the office area, nor did he see an assault or "anything unusual" take place, and that defendant made these false statements to Detective Lee *knowing* that Kim had murdered Garcia. The magistrate also reasonably concluded that defendant made these false statements to Detective Lee *with the intent* of shielding Kim from prosecution for the murder, based on his additional statements to Detective Lee that Kim "was a good boy" and he would be surprised to learn that Kim would be involved in a murder.[4]

Defendant argues that his statements to Detective Lee amounted to no more than a failure on his part to report a crime, which is insufficient to support an accessory charge. He relies on *Findley v. State* (Tex.Crim.App. 1964) 378 S.W.2d 850, 852, where the court observed that a witness's statement that he knew nothing about a burglary was insufficient to make him an accessory to the burglary. Indeed, a statement that one *knows nothing* about a crime, even if false, is equivalent to a passive nondisclosure or refusal to give information, which is insufficient to support an accessory charge. (*Ibid.*; *Duty, supra,* 269 Cal.App.2d at pp. 103–104.)

■ Here, however, the magistrate reasonably concluded that defendant did more than merely tell Detective Lee he knew nothing about the murder of Garcia. The evidence showed that defendant was present in the Rama Foods office with Garcia and that Garcia was murdered in the office. But defendant told Detective Lee he did not see Garcia in the office or at any other time; he did not witness any assault on Garcia; and, indeed, he saw "nothing unusual" happen at Rama Foods on the afternoon of November 23. These statements were affirmative representations of positive facts: that Garcia was not present at Rama Foods on the afternoon of November 23 and that no murder occurred at that time and place. These affirmative representations, if false, and if made with requisite knowledge and intent (i.e., with the knowledge that Kim murdered Garcia and with the intent that Kim avoid prosecution for the murder) were an overt attempt to change the picture of what happened on November 23 at Rama Foods and thereby shield Kim from prosecution. As such, they are sufficient to support the

---

[4] Contrary to defendant's argument, none of the magistrate's findings were based on "speculation and conjecture." (Cf. *Birt v. Superior Court* (1973) 34 Cal.App.3d 934, 937–938 [110 Cal.Rptr. 321].) Each of the magistrate's findings was based on the evidence presented or reasonable inferences drawn from the evidence.

accessory charge.[5] Affirmative statements of positive facts are distinguishable from a passive refusal to provide information or a denial of knowledge that a crime occurred.

In granting the section 995 motion, the court interpreted the nature and scope of an "affirmatively false statement" too narrowly. The court said, "The fact that . . . a witness falsely denies having knowledge of the crime *or that a person was involved in the commission of the crime* will not in itself render such witness . . . an accessory after the fact." (Italics added.) A statement that a person was not involved in the commission of a crime, if false, is an affirmative falsehood. (*Duty, supra,* 269 Cal.App.2d at pp. 103–104.) Likewise, a statement that no crime occurred, if false, is also an affirmative falsehood.

We do not hold as a matter of law or as law of the case that defendant's statements were in fact "affirmatively false statements." The determination of whether defendant's statements were "affirmatively false" or constituted a mere passive refusal to speak may depend on many facts and circumstances not before us. Defendant's recorded interview with Detective Lee was not admitted into evidence. We do not know the exact context in which defendant may have made certain comments, the tonal inflections used, or what Detective Lee and/or defendant may have said at other times during the interview. All of these factors and more may be relevant in determining whether any statements made by defendant were in fact affirmatively false and intended to be believed, or were simply a refusal on defendant's part to speak with Detective Lee.

It will be for a jury to decide whether defendant's statements to Detective Lee were in fact affirmatively false and whether defendant made the statements with the requisite knowledge and intent, or for some other purpose. Based on the record before us, however, there was a rational basis to support the magistrate's conclusion that defendant made affirmatively false statements with the requisite intent. The evidence is therefore sufficient to support the accessory charge.

---

[5] Defendant's reliance on *People v. Nguyen, supra,* 21 Cal.App.4th at pages 527 and 539, discussed above, is also misplaced. There, the third defendant, Ahn Tran, told police he was present at the scene of the crimes but downplayed his role, saying he had been given cash and jewelry to hold. Defendant argues that Tran's statement was "the equivalent of saying that the robbery and sexual assault never occurred." Not so. The record showed that Tran made no affirmative statements to the effect that the crimes never occurred. Thus, contrary to defendant's suggestion, the court's reversal of Tran's conviction for being an accessory to the sexual assault was not based on his affirmative statement that the crime did not occur. Instead, the reversal was based on the lack of any evidence that Tran did or said anything to help his cohorts escape or avoid prosecution for the sexual assault.

## IV. DISPOSITION

The order setting aside the information is reversed.

McKinster, Acting P. J., and Miller, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 20, 2007, S152114. Kennard, J., was of the opinion that the petition should be granted.