Filed 9/22/15  P. v. Montgomery CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EMESHIA DELAYSHON MONTGOMERY et al.,<br><br>        Defendant and Appellant. | D068478<br><br><br><br>(Super. Ct. No. FSB1302333) |

APPEAL from a judgment of the Superior Court of San Bernardino, Harold T. Wilson, Jr., Judge.  Affirmed.

Alan S. Yockelson, under appointment by the Court of Appeal, for Defendant and Appellant Emeshia Delayshon Montgomery.

Christopher Nalls, under appointment by the Court of Appeal, for Defendant and Appellant William Jason Jones.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A.

Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted William Jones of kidnapping (Pen. Code,[1] § 207, subd. (a); count 1), false imprisonment (§ 236, count 2), assault with force likely to produce great bodily injury (§ 245, subd. (a)(4); count 3), second degree robbery (§ 211, count 4), torture (§ 206, count 5), aggravated mayhem (§ 205, count 6), and four counts of attempted sexual penetration with a foreign object (§§ 664/289, subd. (a)(1)(A); counts 7-10). With regard to Jones, the jury found as to counts 5 and 6, Jones was armed with a deadly weapon (§ 12022, subd. (b)(1)). As to counts 7 through 10, the jury found Jones was armed with a deadly weapon (§ 12022.3, subd. (b)). Jones admitted five prison priors (§ 667.5, subd. (b)(5)).

Emeshia Delayshon Montgomery was convicted as an accessory after the fact. (§ 32, count 11.)

The court sentenced Jones to an indeterminate term of seven years to life consecutive to a determinate term of 18 years eight months. Montgomery was sentenced to the low term of one year four months. She was granted 540 days of custody credits.

The court imposed various fines and fees on both appellants.

Jones appeals, challenging only the fees imposed by the trial court.[2]

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

[2]    Jones originally contended the sentences for counts 8 through 10 should be stayed pursuant to section 654. Since the opening brief, Jones has withdrawn his section 654 challenge in light of *People v. Correa* (2012) 54 Cal.4th 331.

Montgomery appeals contending there was not sufficient evidence to prove she violated section 32. She also challenges the various fees imposed by the trial court contending the record does not show she had the ability to pay. Jones makes the same argument as to the fees. We will find sufficient evidence supports Montgomery's conviction. We will also find the appellants have forfeited their right to challenge the imposition of fees by failing to raise the issue in the trial court.

STATEMENT OF FACTS

Jones does not challenge the admissibility or the sufficiency of the evidence to support his convictions. Montgomery does not challenge the admissibility of the evidence, but contends it does not show she made any affirmatively false statements to police during their investigation. We will adopt the summary of facts from the respondent's brief as an accurate representation of the record. The lengthy discussion of the evidence in counts 1 through 10 is included to give context to the evidence regarding Montgomery's postoffense statements to police.

The morning of June 4, 2013, the victim, John Doe, went over to Montgomery's apartment on Sepulveda Avenue in San Bernardino to give her some money he owed her. Doe had known Montgomery and Jones for 10 to 12 weeks. Montgomery's nickname was "Mimi," and Jones's nickname was "Chili Red." While Doe was at the apartment, he and Montgomery smoked methamphetamine together. After a while, Doe left.

3

Later that day, Doe saw Monique Miranda. Miranda asked Doe if they could go to Montgomery's apartment. She did not say why. Doe agreed. On the way over, Miranda, who seemed tired at first, became increasingly energized.

When they arrived at the apartment, Miranda stood outside the door. As Doe approached, Jones stuck his head out the door and told Doe to come in. When Doe hesitated, Jones said, "Get the f . . . in here right now," and tried to grab Doe and pull him through the door. Doe backed up. Miranda, who was behind Doe, pushed him through the door and into the living room. Montgomery and a man Doe knew only as "Big E" were in the room.

Jones pushed Doe onto the small sofa. Miranda and Montgomery sat down on the large sofa. Jones asked Doe if he was "messing around" with Montgomery. Doe told Jones he was not. "Big E" held Doe's arms behind his back. Jones pulled out a knife. Jones punched Doe, and stabbed him in the ears, nostrils, and legs. Jones put his knee between Doe's legs and pushed it into his groin. Meanwhile, Miranda cheered him on, saying, "He deserves it," he's a "child molester." "Hit him. Beat him harder. That's what he gets." "Beat his ass. He deserves it."

Jones went through Doe's pockets, and removed pictures of Doe's children, his house keys, and a small sack of crystal meth. Jones, Miranda, Montgomery, and "Big E" smoked the meth. Jones said to Doe, "I know you have to have more than this." Doe told Jones there was $40 at his house. Jones put the pictures of Doe's children in front of Doe and told Doe he was never going to see them again. Doe told Jones that if he stopped what

4

he was doing, Doe would get some money from his (Doe's) brother and give it to Jones. Jones refused.

After about 20 to 30 minutes, Jones wrapped a telephone cord around Doe's wrists and told him to go to the kitchen. When Doe got to the kitchen, Jones said, "No. No. Not in the kitchen. Get to the restroom." Jones and "Big E" escorted Doe to the restroom. They pushed him through the door. Jones said, "Shut the f . . . up. Get in there." Jones forced Doe to get down on the floor. Jones left the restroom for a minute. He returned carrying some more cords. He and "Big E" used the cords to tie Doe's hands and ankles behind his back. When Doe made a noise, Jones told him to shut up, put a rag in his mouth, and tied another rag around his face.

Jones picked Doe up and slammed him, head first, into the corner of the restroom. Jones said, "Shut up, pussy." Jones brought Montgomery into the restroom and said, "This is what you want." Jones opened Montgomery's shirt, played with her breasts, and asked Doe, "Is this what you want?" Jones pulled his penis from his pants and told Montgomery to start sucking it. He told Doe, "You're going to get this put inside of you." "Is this what you want? This is going to go in you next. This is what you're going to get punk." Jones bent Montgomery over the sink and had intercourse with her while asking Doe, "Is this what you want?" Jones flipped Doe on his back, put a cigarette on Doe's chest, and told him it was supposed to stay there until Jones took it off or until Jones and Montgomery finished having sex.

When Jones finished, he wiped off his penis with a tissue and threw the tissue towards Doe. Jones said, "If you want to know what it smells like, this is what it smells

5

like." "Can you smell that? Is that what you're here for?" Every time Doe made a noise, Jones beat him. Jones left the restroom, returned with a broom, and pulled Doe's pants down. Jones tried several times to shove the broom down Doe's anal cavity but Doe wiggled out of the way.

Jones removed the rag from Doe's mouth, got a pair of pliers, and tried to pull his teeth out. One tooth came loose and later fell out. Jones unbent some metal coat hangers, wet a towel, put the towel on the hangers, stuck the hangers in a light socket, and put them on Doe's back. An electric current ran through the hangers and burned Doe's skin. Jones whipped Doe with a telephone cord and burned cigarettes on his back. Jones asked Montgomery to call his cousin and have the cousin bring Jones his gun. Jones said, "I should kill you."

When Jones was finished torturing Doe, Jones, Montgomery, and Miranda talked about what they were going to do. They decided one of them would call the police, and tell the police Doe was a burglar who broke into the house. They tried to figure out who would call and practiced what that person would say. When the conversation was over, Montgomery remained in the house while the others left. Doe tried to loosen the ties so he could break free.

Montgomery came into the bathroom and asked Doe, "Do you want me to tell Chili Red you're trying to escape? Because I will call him and tell him you are trying to escape." Doe stopped moving and waited for the police to arrive.

At 11:43 a.m. on June 4, Montgomery dialed 9-1-1. Montgomery asked the 9-1-1 operator to send the police over to her house. She told the operator that at about 5:00 a.m.,

6

"some guy," who was an acquaintance of her boyfriend, broke into the house. He broke a window and came inside. The operator asked Montgomery why she waited seven hours to call the police. Montgomery told the operator that the guy's mother did not want to see him, and asked her to call. The operator told Montgomery she was not making any sense, and asked her if she or her boyfriend had been allowing the man to stay there. Montgomery responded, "No, he's tied up. . . . My boyfriend tied him up and went to go tell his people. . . . They said to call the police." The operator asked Montgomery what the boyfriend used to tie up the victim. Montgomery told the operator he used a phone cord. Asked how long he had been tied up, Montgomery said he had been tied up for an hour or an hour and a half, "because he came back over." The operator told Montgomery the police were on their way and terminated the call.

San Bernardino Police Officer Kyle Lundy responded to the call. He spoke to Montgomery more than once. At first, Montgomery said that around 5:00 a.m., someone broke into the apartment. She thought he entered through the broken window on the south side. She was there at the time. The person was captured. Later, Montgomery said she was not there. She returned to her apartment, and the man was already there. Officer Lundy asked her where the man was. Montgomery said he was in the bathroom. Officer Lundy went into the bathroom and opened the door. Doe was lying face down. His hands and feet were tied.

Thinking there was a burglar detained in the bathroom, Lundy called for backup. When other officers arrived, Lundy had them make sure no one else was in the apartment, then asked them to wait upstairs with Doe while he spoke further with

7

Montgomery. Montgomery told Lundy that she and her son were the only ones who lived in the apartment. She then said her boyfriend, Jones, lived there on and off. Officer Lundy asked Montgomery if she knew Doe. She told him Doe was a friend of Jones's, then changed her story. She said she had only seen him two or three times. She then said he had been to the apartment in the past.

Montgomery told Lundy that Doe came over on June 3 around 9:00 a.m. They smoked marijuana together. She then said they smoked marijuana and methamphetamine. Doe was there for only 20 minutes. The next morning, at 1:00 a.m., someone knocked on her door. She yelled out from her upstairs bedroom. She heard Doe's voice. She went back to sleep.

Around 5:00 a.m., she woke up and saw Doe standing in her bedroom doorway. She asked him why he was there. He did not respond. Doe came into the bedroom, sat on the bed, moved to a wooden chair in the bedroom, and refused to answer her questions about what he was doing there. Doe left. She telephoned Jones and told him what happened.[3] Around 8:00 a.m., as Montgomery was getting ready to go to the store with a friend, Jones came over. Montgomery left. When she returned about 9:30 a.m., Jones was still there. Jones told her that Doe came back to the apartment while she was gone, and Jones had tied him up and put him in the bathroom. Montgomery looked in the bathroom. Doe's hands and ankles were bound. Montgomery said

---

3    Detective Lundy asked Montgomery for Jones's phone number. Montgomery said she did not know his number.

8

nothing else about the events which had occurred that day. She failed to mention that two other people, Miranda and "Big E," were also there at the time. The additional information would have helped Lundy determine whether Doe was a burglar or a victim.

Jones was arrested on June 4. Detective Dennis Houser transported Jones to the police station and advised him of his *Miranda*[4] rights. Jones waived his rights and agreed to make a statement. Jones admitted forcing Doe into the apartment, slapping him, stabbing him, tying him up in the bathroom, putting a rag in his mouth, striking him with a phone cord, burning a cigarette on him, putting a hot coat hanger on his back, and taunting him while engaging in sexual acts with Montgomery. He denied placing the hanger in an electrical outlet, trying to force a broomstick up Doe's anus, or attempting to remove Doe's teeth with a pair of pliers.

Later that day, police executed a search warrant at the Sepulveda Avenue apartment. They found two glass methamphetamine pipes under the staircase, cigarette butts and a wire coat hanger in the trash, and a piece of Kleenex in the bathroom.

## DISCUSSION

## I

## *SUFFICIENCY OF THE EVIDENCE*

Montgomery contends the evidence does not show that she harbored or aided and abetted Jones, the principal in the 10 other counts. She argues that the evidence only

---

4    *Miranda v. Arizona* (1966) 384 U.S. 436.

shows she failed to disclose certain facts to police. We disagree. As we will discuss, Montgomery, Jones and Miranda agreed that police would be called and falsely told that Doe was a burglary suspect. Montgomery intentionally mislead police into thinking that the victim of Jones's offense was actually a burglar who they had apprehended. As a result police took the victim into custody thinking he was a suspect. Montgomery did more than enough to qualify as an accessory after the fact.

## A. Legal Principles

When we consider a claim of insufficiency of the evidence to support a conviction we apply the familiar substantial evidence standard of review. Under that standard we review the entire record, drawing all reasonable inferences in favor of the trial court's decision. We do not make credibility decisions nor do we reweigh the evidence. We determine whether there is sufficient substantial evidence in the record from which a rational jury could have found the elements of each offense were proved beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 447, 578.) We apply the same standard of review whether the evidence is direct or circumstantial. (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)

The crime of accessory after the fact is defined in section 32 which provides: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that the principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

10

The elements of the crime of being an accessory are: (1) someone other than the defendant committed a specific, completed felony; (2) the defendant harbored, aided or abetted the principal; (3) the defendant had knowledge that the principal had committed a felony, or was charged or convicted of a felony; and (4) the defendant harbored, concealed, or aided the principal with the specific intent that (s)he avoid or escape from arrest, trial, conviction or punishment. (*People v. Nuckles* (2013) 56 Cal.4th 601, 607.)

False and misleading statements to police, designed to help the principal evade arrest or prosecution are sufficient to prove a person is an accessory to a felony. (*People v. Plengsangtip* (2007) 148 Cal.App.4th 825, 836.) However, mere passive failure to provide information to police is not sufficient to prove a person is an accessory to a felony. (*Ibid.*)

## B. Analysis

Although Montgomery contends she was passive and merely failed to give all the information to police, the record does not support that contention.

Simply put, Montgomery, Miranda and Jones agreed on a plan to mislead the police after Jones and Miranda left the crime scene. Montgomery agreed to call police and falsely claim that Doe had broken into the dwelling and was therefore a burglar. She informed the dispatcher falsely that Doe was a burglar who had been detained. The dispatcher listed the call as involving a burglary suspect who had been seized.

When police arrived, Montgomery continued to tell the story of a burglary and that Doe had been captured and detained. She gave several false versions of how Doe got into the dwelling. Her false stories directed police away from Jones, who had left, and

11

pointed to Doe as the suspect. Indeed, police detained Doe as a suspect until they were able to sort out the real facts.

Plainly, Montgomery intentionally aided Jones in evading arrest and prosecution by falsely directing the police to a burglary version of the events, for which she was present and knew her story was false. The fact that she was not successful in aiding Jones to evade capture does not mean she was not an accessory to Jones's felonies. (*People v. Plengsangtip, supra*, 148 Cal.App.4th at p. 836.)

II

*COURT IMPOSED FEES*

The trial court ordered both Montgomery and Jones to pay fees to the county to cover portions of the costs of appointed counsel and the probation investigation. Neither defendant objected to the court ordered fees. Montgomery contends the court erred in imposing the fees because there was no proof that she had the ability to pay.

Both appellants acknowledge that the Supreme Court has since issued two opinions which make clear that failure to object to court ordered fees at the time of sentencing forfeits appellate review of the fees. (*People v. Trujillo* (2015) 60 Cal.4th 850 (*Trujillo*); *People v. Aguilar* (2015) 60 Cal.4th 862.) Both appellants contend the Supreme Court cases should not be applied "retroactively" to them. Jones separately contends forfeiture should not apply to the order to reimburse the county for counsel fees as there might be a conflict of interest on the part of defense counsel as discussed in *People v. Viray* (2005) 134 Cal.App.4th 1186 (*Viray*). We disagree with both

12

contentions and will find the appellants have forfeited appellate review of the court imposed fees.

## A. Conflict of Interest

The court in *Viray* was concerned that defense counsel might not object to an order reimbursing counsel fees in order to benefit him or herself, thus creating a conflict of interest. (*Viray, supra* 134 Cal.App.4th at p. 1214.) The court concluded it would be inappropriate to apply forfeiture to a defendant whose attorney failed to object due to a conflict of interest. Whatever the merits of the general principle might be, there is no potential for a conflict of interest in the fees imposed here. The fees ordered are to reimburse the county for a portion of the money the county spent on appointed counsel. The money is not payable to defense counsel and there is nothing in the record to even hint that defense counsel's present or future compensation may be impacted by any reimbursement a defendant might pay to the county.

The court in *Aguilar, supra*, 60 Cal.4th at pages 865 through 870 dealt with fees ordered for both probation investigation and defense costs. The court held that failure to object to such fees constitutes a forfeiture of appellate review. While the court noted it might reach a different conclusion on waiver of counsel fees if a conflict of interest was shown, it did not find such conflict in the case before it. (*Id.* at p. 868, fn. 4.) In *Aguilar* defense counsel was provided by the county as part of its publicly funded criminal defense function. The court did not find a conflict of interest in that circumstance. In

13

*Trujillo, supra*, 60 Cal.4th at pages 853 through 861, the court also held that failure to object to fees imposed at sentencing constituted forfeiture of appellate review.[5]

### B.  Retroactive Application of Forfeiture

In their reply briefs Jones and Montgomery argue we should not apply the forfeiture doctrine of *Aguilar, supra,* 60 Cal.4th 862 and *Trujillo, supra,* 60 Cal.4th 850 to them as it would be a retroactive application of a new rule.  We do not pause long with this contention.

First, the Supreme Court did not limit its decision to future cases, nor is there any reason they should do so since forfeiture has long been a part of appellate review of trial court decisions to which there was no objection.

In addition, the court has applied forfeiture to sentencing decisions for a number of years before *Trujillo, supra,* 60 Cal.4th 850 and *Aguilar, supra,* 60 Cal.4th 862.  In *People v. Welch* (1993) 5 Cal.4th 228, 234, the court applied forfeiture to the failure to object to probation conditions.  In *People v. Scott* (1994) 9 Cal.4th 331, 352, the court applied forfeiture to the full range of sentencing decisions.  Thus while *Trujillo* and *Aguilar* have resolved the issue of whether forfeiture should apply to fees imposed without objection, the court has not created a new concept in the criminal law which

---

5       Both appellants contend that if we find the issues forfeited then their respective trial counsel were ineffective.  (*Strickland v. Washington* (1984) 466 U.S. 668.)  Neither appellant has provided any record from which we can determine why counsel did not object or whether an objection would have likely produced a different outcome.  This issue cannot be resolved on direct appeal, given the record before us, and may have to be decided by way of a petition for writ of habeas corpus.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

should be limited to future cases. Indeed, the court "retroactively" applied forfeiture to both defendants in *Trujillo* and *Aguilar* since their sentences were imposed years before the high court's decision. There is no reason why the forfeiture doctrine should not be applied to these appellants.

DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.