Filed 11/4/13  P. v. Ruvalcaba CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061753 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF136340) |
| DANIEL ANTHONY RUVALCABA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Bernard J. Schwartz, Judge.  Affirmed.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, A. Natasha Cortina and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Daniel Anthony Ruvalcaba of the first degree murder of Michael Benge (Pen. Code, § 187, subd. (a); count 1)[1] and the second degree murder of Benge's sister, Denaya Shanks (§ 187, subd. (a); count 2).[2] As to count 1, the jury found true a multiple murder special circumstance allegation (§ 190.2, subd. (a)(3)). As to both counts, the jury found true gang benefit enhancement allegations (§ 186.22, subd. (b)) and vicarious firearm use enhancement allegations (§ 12022.53, subds. (d) & (e)). Ruvalcaba also admitted having a prior strike conviction (§ 667, subds. (c), (e)(1)), a prior serious felony conviction (§ 667, subd. (a)), and a prior prison commitment conviction (§ 667.5, subd. (b)). The court sentenced him to a prison term of life without the possibility of parole, plus 80 years to life, plus five years.

Ruvalcaba appeals, contending his conviction must be reversed because the court once again prejudicially erred in admitting double hearsay against him (see fn. 2, *ante*). He further contends his trial counsel provided ineffective assistance by failing to: (1) request the court strike portions of two prosecution witnesses' testimony, object to portions of the prosecution's gang expert's testimony, and elicit certain favorable

---

[1]   Further statutory references are also to the Penal Code unless otherwise stated.

[2]   This was Ruvalcaba's second trial. He was previously tried with codefendant Ralph Rojas. The first jury convicted him of two counts of first degree murder. We reversed his conviction after concluding the court prejudicially erred in admitting double hearsay statements against him. (*People v. Solorio* (Aug. 9, 2011, D056842) [nonpub. opn.] (*Ruvalcaba I*).)

testimony from a defense witness.  We conclude these contentions lack merit and affirm the judgment.

BACKGROUND

*Prosecution Evidence*

Ruvalcaba, Vincent Solorio, and Rojas were good friends.  Vincent's mother, Gina Solorio,[3] and Ruvalcaba's mother were best friends.  Ruvalcaba spent a lot of time at the Solorio home, and Gina treated him like a son.  Gina also treated Rojas like a son.  The Solorio family took Rojas in after his mother died and he lived with them on and off.  He was living with them in December 2006, when the killings in this case occurred.

In addition to being good friends with one another, Ruvalcaba, Vincent and Rojas were good friends with Benge and Benge's brother.  The five men grew up together and hung out together almost every day.

Ruvalcaba and Vincent were members of the Casa Blanca Rifa gang (CBR gang).  Rojas was at least an associate of the gang and may have been a member.  In October 2003, Ruvalcaba, Vincent and two other CBR gang members forced a man and a woman out of a car at gunpoint and took the car.  The next day a police officer recovered the car in an area marked with CBR gang graffiti.

In October 2006 Gina and her husband separated, and Gina stayed with a friend in Colton.  On October 29, 2006, Gina's husband and Benge went to the home where Gina

_____

3     Where multiple parties like Vincent and Gina share the same surname we use first names for clarity.

3

was staying. Gina's husband confronted Gina because he believed she was cheating on him. At one point during the encounter, Gina's husband pointed a gun at Gina. Gina moved behind Benge, but Benge moved out of the way, leaving her unprotected. Gina was very angry with Benge because she believed his act of stepping away and failing to protect her was disrespectful. Gina told her friend, Patricia Revelez, she was angry at Benge and was going to put a "green light" on him.[4]

By December 2006, Gina and her husband had reconciled and were once again living in the same home. Patricia and her daughter, Britaini Revelez, were living with them. Patricia was dating Benge and Britaini was dating Vincent.

On December 7, 2006, Benge was visiting with Patricia on the Solorios' porch. He went in the house to wake Gina's husband. When he returned, he told Patricia that Gina had kicked him out. Patricia did not understand why Gina did this since Benge was "in the house all the time." Patricia believed Gina was still angry at Benge because he disrespected her during the Colton incident.

During the day on December 8, 2006, Ruvalcaba was at the Solorio home with Vincent and Rojas. In the evening, the three men got dressed to go to a gathering Benge and his brother were hosting in the garage of their parents' home. When Rojas left the

---

[4]    The People's gang expert testified that, in gang culture, putting a green light on a person means to target the person for a significant beating or death. According to the gang expert, a green light only comes through the state prison system and the expert did not believe Gina had the necessary influence to put a green light on anyone. The gang expert also did not believe the killings in this case resulted from a green light sanctioned from the state prison system. However, the gang expert believed the killings were related to the Colton incident.

Solorio home, Vincent and Ruvalcaba followed him. On their way out, Vincent remarked to Ruvalcaba, "Come on. Let's go. Got to have the homeboys' [*sic*] back, you know?"

Although Benge's brother had invited Ruvalcaba, Vincent and Rojas to the gathering, he felt a "weird vibe" from them when they arrived. In addition, he thought it was strange they were only talking to one another and not to anyone else. Benge's mother and father also thought they were acting unusually.

About 45 minutes after arriving, Ruvalcaba, Vincent and Rojas left. They stopped at Rojas's grandmother's house briefly and then returned to the gathering.[5]

When most of the guests had left the gathering and Benge's parents had gone to bed, Benge went to a nearby grocery store. Ruvalcaba, Vincent, Rojas, and Benge's sister invited themselves along. Benge's brother stayed behind.

Around 9:30 p.m. that evening, a husband and wife drove to the grocery store. As they pulled their car into the store's driveway, a group of four men and one woman walked in front of them. After the group passed by, the couple proceeded into the driveway and, as they were parking, they heard two gunshots coming from behind their car. They thought someone might be hurt, so they parked their car and went to help. They found the woman and one of the men from the group that had just walked by them

---

[5]      Five days later, a sheriff's officer found a small gun pouch in the garage of Rojas's grandmother's home. The pouch was empty and no gun was found in the garage.

5

lying on the ground. The three other men from the group were jogging away while periodically looking over their shoulder.

After the killings, Vincent, Ruvalcaba and Rojas did not return to Benge's parents' house. They also never contacted Benge's brother or his parents. Instead, they ran to Rojas's grandmother's house. Paul Martinez was standing in front of Rojas's grandmother's house when they arrived. Rojas told Martinez, "[W]e dealt with [Benge]" and "Vincent shot [Benge] in the face at close range." Rojas then remarked, "[W]e need to get out of here" and the three men left, walking toward Vincent's house.

When a police officer arrived at the grocery store parking lot, he found Benge and his sister lying on the sidewalk about two feet away from one another. Benge's sister had a gunshot wound on her left temple and was pronounced dead at the scene. There was stippling around the wound indicating the gunshot was fired at close range. Benge had a bullet lodged under the skin on his forehead. His breathing was shallow and he was nonresponsive. He was taken to a hospital, where he died the following day.

Meanwhile, Britaini was waiting on the porch of the Solorios' home for the three men to return when she noticed police cars at the grocery store. She walked to the store with Gina and Rojas's girlfriend. A bystander told them Benge and his sister had been shot. Britaini tried to call Vincent, but she could not reach him because his phone was off.

Gina, Britaini, and Rojas's girlfriend walked to Ruvalcaba's house, but the three men were not there and no one was able to contact them. The women went back to the Solorios' home, but the three men did not return that night.

6

Within a couple of hours after the shooting, police detectives and members of the Special Weapons and Tactics team went to the Solorios' home. They questioned everyone in the home about the killings and the three men's whereabouts.

The day after the killings, Gina asked Patricia to drive her to a mall area to pick up the three men. When the men got in the car, Vincent gave Gina a watch and told her to get rid of it because, he "was standing too close, and it got blood splattered all over it, and it's dirty." Vincent put the watch in Gina's purse, remarking "You know what to do."

Patricia dropped Ruvalcaba off at his home and took Gina, Vincent and Rojas back to the Solorios' home. Gina gathered clothes for the two men while they took showers. After the men showered, they got into the Solorios' van with Gina, Britaini, and Rojas's girlfriend. Gina picked up Ruvalcaba and drove him to his girlfriend's house. She then took Vincent, Britaini, Rojas and Rojas's girlfriend to a hotel in another county, checked them in, and left.

Gina returned the following morning and either Vincent or Rojas told her they needed to talk with her. The two men went outside and Gina followed them. When the trio returned to the room, Vincent and Rojas gathered some of their belongings and took them out to the van. Rojas's girlfriend went with them. Gina then told Britaini, "The boys just told me what happened."[6] Britaini asked, "What?" Gina replied, "They killed [Benge] and [Benge's sister]." Britaini asked, "What do you mean? What happened?" Gina told Britaini that the three men went to Benge's house and "played off what they

---

6    The People introduced Britaini's testimony about the conversation because the court declared Gina unavailable as a witness after Gina refused to testify.

7

were planning that night." When the group went to the store, the plan "fell into place." Vincent intentionally lagged behind, pulled a gun out, and shot Benge after first remarking, "Who's got the gun pointed at them now, motherfucker?" Since Benge's sister witnessed the killing, Vincent told her, "I'm sorry I have to do this" and shot her, too.

Gina then asked Britaini, "You know why they did it; right?" Britaini replied, "No. Why?" Gina told her Vincent and Rojas said it was because Benge failed to protect Gina during the Colton incident.

After Gina told Britaini what Vincent and Rojas said, Britaini packed up her stuff and they all left the hotel. Gina dropped Britaini off at a park near the Solorios' home and told her to walk from there so no one would see them. Gina then left with Vincent and Rojas and Britaini did not see them again for a while.

The same day, Britaini met up with Vincent in a parking lot. She asked him whether he killed Benge and Benge's sister. He initially would not give her a direct answer, but she continued to press him and he eventually admitted to her that he had killed them.

Vincent, Rojas and Ruvalcaba were subsequently arrested. At the time of his arrest, Ruvalcaba was living with the Solorio family at a new address.

A gang expert testified that, at the time of the killings, the CBR gang was an ongoing organization with approximately 200 members, affiliates, and associates; it used common signs or symbols; its primary activities included weapons violations, violent assaults and homicides, carjackings, and narcotics sales; and its members had committed multiple predicate offenses. The gang expert believed that, at the time of the killings,

Vincent and Ruvalcaba were active members of the CBR gang and Rojas associated with the CBR gang. The expert further believed the killings were committed by CBR gang members in association with one another. He based this opinion on his training and experience, Vincent's and Ruvalcaba's admissions to being CBR gang members, and the three men's prior involvement in incidents where their victims and witnesses knew them to be CBR gang members. He also based his opinion on the carjacking incident because Vincent's and Ruvalcaba's accomplices were CBR gang members, the crime involved sophistication and teamwork, and the stolen vehicle was left in an area marked with CBR gang graffiti.

On cross-examination, the gang expert testified he believed Vincent would have felt disrespected by Benge's failure to protect Gina during the Colton incident and this would have given Vincent a personal motive for vengeance. On redirect examination, the gang expert also testified he believed Rojas may have felt disrespected by Benge's failure to protect Gina because "Gina was as much his mother as Vincent's mother." The gang expert explained that Vincent, Rojas, and Ruvalcaba were essentially brothers and they treated Gina as their mother. The gang expert believed Gina told Vincent about Benge's act of disrespect, this information was relayed to Rojas and Ruvalcaba, and all three men were angry because Benge had "disrespected [their] mother." The gang expert believed on the night of the shootings, Ruvalcaba "went to back his homey up." Although the gang expert acknowledged Ruvalcaba may not have known Vincent intended to kill Benge that night, the gang expert believed Ruvalcaba knew there was going to be a confrontation between the two men.

9

*Defense Evidence*

A former inmate testified to a jailhouse conversation he had with a person he was almost certain was Vincent, in which Vincent bragged about shooting and killing a brother and sister on the way back from a grocery store in the Casa Blanca area. Vincent said he killed the brother because the brother was "a dirty person" and he killed the sister because she was a witness. Although Vincent claimed sole responsibility for the killings, he had a friend with him when the killings occurred. Vincent said as the group was leaving the grocery store, he and his friend parted company with the brother and sister. Then, he and his friend circled back, came up on the brother and sister again, and Vincent shot them.

Vincent also said there was another witness who had taken the gun to or gotten the gun from someone's grandmother's house. Vincent did not say whether the friend who was with Vincent at the time of the killings was involved in whatever took place at the grandmother's house with the gun.

A district attorney's office investigator testified the inmate told him another Hispanic male was with Vincent during the killings, but only as a witness.

Ruvalcaba's grandmother testified Ruvalcaba started living with her after he was released from custody for another offense. He moved in with Gina a week or two before his arrest after he learned the person he believed was his father was not actually his biological father.

Ruvalcaba's parole officer testified Ruvalcaba was released from custody on November 29, 2006. He was arrested for his involvement in this case on May 7, 2007.

Ruvalcaba's uncle testified Ruvalcaba and his father went to Ruvalcaba's grandmother's house just after the killings. The three men watched television there and talked for about 20 minutes before Ruvalcaba and his father left. Ruvalcaba's uncle never told anyone this information until the day before he testified.

*Rebuttal Evidence*

Six days after the killings, Ruvalcaba told a police detective he heard shots on the way back to Benge's house from the grocery store. He, Vincent and Rojas ran from the area to a cul-de-sac and jumped into a car with some girls. They went to an area near a mall and hung out with the girls and others. Gina picked them up the next day and dropped Ruvalcaba off at his home. Ruvalcaba denied he and Vincent had any involvement in the killings.

DISCUSSION

I

*Admission of Double Hearsay*

A

1

In *Ruvalcaba I* (see fn. 2, *ante*), we concluded the court erred in admitting Britaini's testimony relaying Gina's statements about "the boys" admission to killing Benge and his sister because it was unclear from the record whether the admission was intended to include Ruvalcaba. (*Ruvalcaba I*, *supra*, D056842, at pp. 40-41.) We similarly concluded the court erred in admitting Britaini's testimony relaying Gina's statements about the reasons for and planning behind the killings because it was unclear

11

from the record whether this information originated from Vincent and Rojas, or from Gina herself. (*Id.* at p. 40.) We concluded the errors were prejudicial to Ruvalcaba because the evidence against Ruvalcaba was not sufficiently strong to preclude a reasonable possibility of a more favorable outcome absent the error. (*Id.* at p. 41.)

2

Before Britaini testified in this case, the court, mindful of our concerns in *Ruvalcaba I*, conducted a hearing to determine the admissibility of her testimony. At the hearing, she testified the evening after the killings she went with Gina, Vincent, Rojas, and Rojas's girlfriend to a hotel in another county. Gina checked them into the hotel and then left to get clothes for Vincent and Rojas. When Gina returned the next morning, Vincent and Rojas asked to speak with her and the three went outside. Afterwards, as Vincent, Rojas, and Rojas's girlfriend loaded up Gina's van to leave, Gina told Britaini that Vincent and Rojas had just told her "they"—meaning Vincent, Rojas, and Ruvalcaba—were the ones who killed Benge and Benge's sister. They shot Benge first and then shot Benge's sister because she was a witness. Gina said "they"—again meaning Vincent, Ruvalcaba, and Rojas—had talked about killing Benge, decided how to do it and that night their plan just worked out and fell into the place. Gina also said they killed Benge because Benge left her uncovered and unprotected during the Colton incident.

The main point of contention during the hearing was whether Gina's remarks about the men's motivation and planning were Gina's own suppositions or whether Gina was merely relaying information Vincent and Rojas had just told her. Britaini believed Gina

12

was merely relaying information Vincent and Rojas had just told her based on Gina's prefatory remark, "Vincent and [Rojas] just told me," and the subsequent conversation flow.

After defense counsel made several failed attempts to clarify Britaini's testimony on this point, the court interjected, "What we're trying to establish here, ma'am, is whether or not Gina told you these things that the boys told her, and she was just relaying that to you, or whether some of it was from the boys, some of it was from her own mind, or thoughts, or whether it was all from her own thoughts? [¶] . . . [¶] We just need to know whether or not the boys said something to her, and she told you what the boys said." Britaini responded, "She was relaying the conversation to me."

The court continued, "Right. Or whether or not she's just speaking on her own and perhaps surmising it was done for a different reason, or a reason not told to her by the boys. So we just need to know if it was something that came directly from the boys completely, or whether or not it was something that she made up on her own." Britaini responded, "Well, by the way she had told me, it came from the boys, to her, then to me. That's what I believe the conversation was."

Not satisfied with Britaini's responses, defense counsel continued to press her for clarification. She continued to maintain that, because of Gina's prefatory remark and the conversation flow, she believed Gina was relaying what Vincent and Rojas had just said outside. Nothing about the conversation, including Gina's statements, voice, or mannerisms, gave Britaini any reason to believe otherwise.

13

At the conclusion of the hearing, the court found Britaini's testimony was admissible because Vincent's and Rojas's statements to Gina were declarations against their penal interest and Gina's statements to Britaini were declarations against Gina's penal interest. In reaching its decision, the court reasoned the statements from Gina to Britaini had to have originated from Vincent and Rojas because there was no other way for Gina to "know how the planning took place or what the reason behind or motive behind the shootings would be, unless she was told."

As summarized in the background section above, Britaini's trial testimony largely tracked her hearing testimony. During her trial testimony, defense counsel pointedly asked her, "Would it be fair to say that everything that Gina told you right then, your understanding was the boys, specifically [Rojas] and Vincent, had just told her that?" Britaini replied, "Yes."

B

1

The parties agree Britaini's testimony about Vincent's and Rojas's remarks to Gina was double hearsay and was only admissible if both levels of hearsay fell within some exception to the hearsay rule. (Evid. Code, § 1201; *People v. Riccardi* (2012) 54 Cal.4th 758, 831.) Ruvalcaba contends the testimony was not admissible because Gina's statements to Britaini, the second level of hearsay, were not against Gina's penal interest. More particularly, he contends the record does not show Gina knew the three men committed the killings before she put Vincent and Rojas up in a hotel and, therefore, Gina's statements to Britaini did not expose Gina to criminal culpability as an accessory.

14

" 'Evidence Code section 1230 provides that the out-of-court declaration of an unavailable witness may be admitted for its truth if the statement, when made, was against the declarant's penal interest. The proponent of such evidence must show "that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." ' [Citation.] 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*People v. Geier* (2007) 41 Cal.4th 555, 584 (*Geier*), overruled on another point by *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, as acknowledged in *People v. Houston* (2012) 54 Cal.4th 1186, 1220.) "A trial court's decision to admit or exclude evidence is a matter committed to its discretion ' "and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Geier*, *supra*, at p. 585.)

"Section 32 defines the crime of 'accessory' as follows: 'Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment,

15

having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony.'

"The crime of accessory consists of the following elements: (1) someone other than the accused, that is, a principal, must have committed a specific, completed felony; (2) the accused must have harbored, concealed, or aided the principal; (3) with knowledge that the principal committed the felony or has been charged or convicted of the felony; and (4) with the intent that the principal avoid or escape from arrest, trial, conviction, or punishment." (*People v. Plengsangtip* (2007) 148 Cal.App.4th 825, 835-836.) "[I]n determining whether a defendant had the requisite knowledge and intent to commit the crime of accessory, the jury may consider 'such factors as [the defendant's] possible presence at the crime or other means of knowledge of its commission, as well as his companionship and relationship with the principal before and after the offense.' " (*Id.* at p. 837.)

As the People point out in their brief, Gina had numerous indications Vincent, Rojas, and Ruvalcaba committed the killings before she put Vincent and Rojas up in the hotel. Among these indications: the men did not return home after the killings and could not be reached by telephone; police detectives and SWAT team members went to the Solorios' home after the killings looking for the men; and, when Gina picked the men up the day after the killings, Vincent asked her to dispose of his watch because he was "standing too close," "it got blood splattered all over it," and Gina knew "what to do."

Even if, as Ruvalcaba asserts, these circumstances do not establish Gina knew the men had committed the killings before she put Vincent and Rojas up in the hotel, Gina's

16

statements were still against her penal interest because she was in the process of assisting them when they told her of their involvement and she continued to assist them afterwards. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 537 [a person who unwittingly aids a perpetrator may become an accessory if the person later learns of the perpetrator's criminal purpose and then does something to help the perpetrator get away with the crime].) Accordingly, the court did not abuse its discretion in finding Gina's statements to Britaini were statements against Gina's penal interest.

2

Ruvalcaba also contends the testimony was not admissible because it is unclear from the record whether Vincent's and Rojas's admissions to the killings included Ruvalcaba as a participant and whether the statements regarding the planning of and motivation for the killings came from Vincent and Rojas, or from Gina. Consequently, he contends the court should have excluded the evidence under Evidence Code section 1230 as untrustworthy and under Evidence Code section 352 as more prejudicial than probative.

However, during the hearing, Britaini specifically clarified Gina's statements relaying who planned and committed the killings included Ruvalcaba, not just Vincent and Rojas. Although Britaini was not asked and, therefore, did not clarify whether Ruvalcaba knew of or shared the same motive as Vincent or Rojas, the lack of clarity on this point is of no moment since aider and abettor liability does not require shared motivation. Rather, a person is liable for a crime as an aider and abettor if the person acts "with 'knowledge of the direct perpetrator's unlawful intent and an intent to assist in

17

achieving those unlawful ends, and . . . conduct by the aider and abettor . . . assists the achievement of the crime.' " (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069.)

As for whether the statements regarding the planning of and motivation for the killings came from Vincent and Rojas, or from Gina, the court and counsel explored this point at length during the hearing. At the conclusion of the hearing, the court found the statements came from Vincent and Rojas, not Gina. On appeal, we uphold a court's determination of preliminary facts made in the course of deciding the admissibility of hearsay evidence if the facts are supported by substantial evidence. (*People v. Riccardi*, *supra*, 54 Cal.4th at p. 831.) Substantial evidence supports the court's determination in this case. Britaini repeatedly maintained that, based on Gina's prefatory remark and the conversation flow, she believed Gina was merely relating what Vincent and Rojas said outside the hotel room. Britaini further testified nothing in Gina's statements, voice, or mannerisms suggested otherwise. As the court reasoned below, Gina would not have known about the planning behind or motive for the shootings unless Vincent or Rojas told her. She also had no reason to come up with the Colton incident as the motive on her own and nothing in Britaini's hearing testimony suggested Gina went off on a tangent during their conversation or was speculating about a possible motive. Ruvalcaba, therefore, has not established the court abused its discretion in finding Gina's statements to Britaini were sufficiently trustworthy and probative to be admissible.

## II

### *Ineffective Assistance of Counsel*

#### A

### *Failure to Request Court Strike Testimony*

#### 1

Patricia testified Gina was particularly close to her boys and Vincent was particularly close to Gina. Patricia also testified Rojas was close to Gina. Patricia explained, "They were all close to her. They do whatever she says." The prosecutor then asked, "How about [Ruvalcaba]? Was he close to her too?" Patricia responded, "He was close to her. They're all close to her."

Because Patricia also testified Gina intended to put a "green light" on Benge for the Colton incident, defense counsel belatedly objected to Patricia's testimony that Vincent, Rojas, and Ruvalcaba did whatever Gina said and asked the court to instruct the jury the testimony was not offered for its truth. Alternatively, he asked that Patricia be recalled as a witness and the court conduct a hearing on "the issue about whether the boys do everything [Gina] tells them to, and why [Patricia] thinks she knows that information." The court indicated defense counsel was free to recall Patricia if he wanted to ask her additional questions. Defense counsel opted not to do so.

Later, Britaini confirmed she too believed the three men did everything Gina told them. When the prosecutor attempted to explore the basis for Britaini's opinion, defense counsel objected. Following a sidebar hearing, during which Britaini briefly testified

19

about the basis for her opinion, and the court sustained the objection.  Then, defense counsel again stated he should have objected to Patricia's similar testimony.

2

Ruvalcaba contends Patricia's and Britaini's opinions that the three men did everything Gina told them lacked foundation and, consequently, were irrelevant. Because defense counsel did not move to strike these opinions, he contends defense counsel provided him with ineffective assistance.

" 'The law governing defendant's claim is settled. "A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions.  [Citations.]  'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.' "  [Citations.]  It is defendant's burden to demonstrate the inadequacy of trial counsel.  [Citation.]  [The California Supreme Court has] summarized defendant's burden as follows:  " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  [Citations.]  Second, he must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' "  [Citation.]  [¶]  Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is

20

a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: " 'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.' " ' " (*People v. Vines* (2011) 51 Cal.4th 830, 875-876.)

The court found and we agree Patricia's and Britaini's opinions that the three men did whatever Gina told them were relevant in light of Patricia's testimony Gina intended to put a "green light" on Benge because the opinions tend to prove Ruvalcaba intended to kill Benge. As the People point out, the testimony did not completely lack foundation as Patricia and Britaini had known the three men and the Solorio family for a long time, they lived in the Solorios' home, and Britaini had dated Vincent for several years. Thus, they would have had personal observations from which to form their opinions.

In addition, the record shows the prosecutor could have supplied additional foundation had the court required him to do so as Britaini's testimony during the sidebar hearing demonstrated she had firsthand knowledge of Vincent, Ruvalcaba, and Rojas committing violent acts at Gina's behest. The court was wary of allowing such testimony as it could open up too many new areas of questioning. Nonetheless, had defense counsel pressed the matter by moving to strike Patricia's and Britaini's opinions for lack of foundation, the court might have allowed the prosecutor to elicit testimony from them showing the bases for their opinions, which would not have aided Ruvalcaba. Moreover, defense counsel was able to substantially undercut Patricia's and Britaini's testimony on

21

this point by eliciting the gang expert's opinion Gina was unlikely to have sufficient influence to obtain the requisite authorization for a green light on Benge. (See fn. 4, *ante*.) Accordingly, contrary to Ruvalcaba's assertions, the record demonstrates defense counsel could have had a rational tactical purpose for not moving to strike Patricia's and Britaini's testimony.

B

*Failure to Object to Gang Expert's Testimony*

1

A key defense theory in this case was that Ruvalcaba merely witnessed the killings and did not plan or participate in them. To support this theory, defense counsel elicited the gang expert's opinion that Vincent's extreme closeness to Gina gave Vincent a personal motive to avenge Benge's perceived disrespect of Gina and Vincent would have looked weak if he did not do something about the perceived disrespect.

During his redirect examination, the prosecutor followed up on defense counsel's questioning:

> "[PROSECUTOR]: Based on what you know about the case, I mean, it was a particularly offensive thing that was done to Gina; correct?
>
> "[GANG EXPERT]: Yes.
>
> "[PROSECUTOR]: [Defense counsel] was asking you about personal disrespect that [Vincent] may have felt as a result of that happening; correct?
>
> "[GANG EXPERT]: Yes.

22

"[PROSECUTOR]: Do you believe that [Rojas] might have been or felt disrespected by that as well?

"[GANG EXPERT]: Yes.

"[PROSECUTOR]: Why?

"[GANG EXPERT]: Because Gina was as much his mother as Vincent's mother. Vincent and [Rojas], for all intents and purposes, were brothers. They are maybe not of blood, but they lived together as brothers, acted as brothers, to include [Ruvalcaba] as well. They were always together, and we heard that in testimony. They are always together, and they treated Gina, whether she was their birth mother or not, treated her as their mother.

"And that disrespect to Gina that she communicated to Vincent, whether it be individually to each boy, or one, and then it went out to the others, there is going to be anger associated with that. You disrespected my mother; therefore, you disrespected me based on our relationship.

"[¶] . . . [¶]

"[PROSECUTOR]: You indicated earlier that Ruvalcaba was considered one of her boys, meaning one of Gina's boys; right?

"[GANG EXPERT]: Yes.
"[PROSECUTOR]: What did you mean by that?

"[GANG EXPERT]: She had made that statement to both Britaini and Patricia. She's made that statement in court proceedings that he's one of her boys.

"[¶] . . . [¶]

"[PROSECUTOR]: So in your expert opinion, do you believe that [Ruvalcaba] could have felt disrespected by [Benge's] actions?

"[GANG EXPERT]: He could have, yes."

A short while later:

"[PROSECUTOR]: How do you think the incident in Colton might factor into whether or not and to what extent this crime occurred, and whether or not it has anything to do with [the CBR gang]?

"[GANG EXPERT]: Well, I believe the incident in Colton was related to—or relayed to other members of the Solorio family, like I said, whether Gina told Vincent or the three boys individually or together, she relayed the information on what happened out there, and that [Benge], by all accounts, stepped away from her when [Gina's husband] pointed a gun at her leaving her exposed and vulnerable, and she took that as a sign of disrespect because [Benge] was living in her home off and on during that time, and was, by Patricia and Britaini's comments, good friends with the Solorio family to an extent. And that she communicated that disrespect, that she left him out there—or he left her out there exposed to [her husband] and that gun.

"[¶] . . . [¶]

"[PROSECUTOR]: Does the fact that there was this interpersonal relationship between all three of them, and that Gina considered all three of them her boys, does that factor into your opinion about what level of participation [Ruvalcaba] had in this crime?

"[GANG EXPERT]: Yes

"[PROSECUTOR]: How so?

"[GANG EXPERT]: I believe that he went to back his homey up. He knew of the incident in Colton through, again, Gina or Vincent, and he may not have known that Vincent's intent was to kill [Benge], but he knew that he was—I believe he knew there was going to be a confrontation between [Benge] and Vincent as a result of what occurred in Colton."

2

Ruvalcaba contends defense counsel provided ineffective assistance by failing to object to the gang expert's redirect testimony because the testimony was speculative, it improperly informed the jury of what the gang expert believed was Ruvalcaba's

subjective knowledge and intent, it involved subject matter which was not beyond the jury's common experience, it did not assist the jury in its determination of guilt, and it usurped the jury's function by telling the jury how to decide the case.

However, part of the challenged redirect testimony was intended to directly counter the inference raised by the cross-examination testimony that Vincent was the only one close enough to Gina to have a personal reason for killing Benge. A successful objection to this part of the redirect testimony could have led the court to strike the related cross-examination testimony, which would have undermined a key defense.

The remainder of redirect testimony was intended to establish the killings benefited the CBR gang. An expert is permitted to testify about gang culture, habits, and the psychology of gangs and gang members. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944; *People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) This testimony typically takes the form of hypothetical questions, although it is not necessarily improper for an expert to testify a particular defendant's actions benefited a particular gang. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1048, fn. 4, citing *People v. Valdez*, *supra*, at p. 507 [finding the court did not abuse its discretion in allowing an expert in a complex case involving concerted action by diverse gang members to testify the gang members acted for the benefit of their respective gangs]; cf. *People v. Spence* (2012) 212 Cal.App.4th 478, 510-511 [disapproving of question to an expert witness that was not in hypothetical form and appeared to unduly focus on defendant as presumptively guilty].)

Had defense counsel successfully objected to the gang expert's gang benefit testimony, the prosecutor likely would have asked substantially similar questions in

25

hypothetical form. Defense counsel could have chosen not to object because the risk of giving the prosecutor an opportunity to further emphasize the information outweighed the benefit of the objection. Therefore, the record demonstrates defense counsel could have had a rational tactical purpose for failing to object to the redirect testimony.

## C

### *Failure to Elicit Favorable Testimony*

#### 1

Before the former inmate testified, the court conducted a hearing to determine the admissibility of the inmate's testimony. At the hearing, the inmate testified Vincent claimed sole responsibility for the killings. The inmate also testified Vincent had mentioned there was another person with him when he killed Benge and Benge's sister, but said the person was not involved and did not know what was going to happen.

Prior to the hearing, the inmate had not listened to the recordings of his interviews with investigators or read summaries of them. During the hearing, the prosecutor attempted to impeach the inmate's testimony about Vincent's companion's level of involvement by asking the inmate whether he recalled "saying something a little different than that about the friend? You know, that friend's level of participation in this whole thing?" The inmate said he did not recall and wanted an opportunity to hear his statements "[b]ecause as of right this second, I can't say I remember word for word everything I was told."

After a few more similar "do you recall" questions by the prosecutor, the inmate again asked to hear his statements to refresh his recollection. The hearing then quickly concluded and the court determined the inmate's testimony was admissible.

Between his hearing testimony and his trial testimony, the inmate refreshed his recollection by listening to recordings and reviewing summaries of the statements he made during his interviews with investigators. When the trial resumed, defense counsel asked the inmate during direct examination:

> "[DEFENSE COUNSEL]: You said on a couple of occasions [Vincent] referred to another—just one other person?
>
> "[FORMER INMATE]: That's what he referred to, yes.
>
> "[DEFENSE COUNSEL]: All right. Did he ever say anything about that other person in terms of what that person—where that person was, or what the role was in that killing?
>
> "[FORMER INMATE]: No.
>
> "[DEFENSE COUNSEL]: Would it—well, did you—do you recall testifying, or giving a statement where you indicated that the inmate—being the guy that's talking to you—told you another Hispanic male was with them during the double killing, but was only a witness?
>
> "[FORMER INMATE]: He—he was there, he didn't shoot. So, yeah, a witness."

The prosecutor also probed this area on cross-examination:

> "[PROSECUTOR]: When you were speaking with him about the friend, did you—well, the impression that you got about the friend, based on your conversation with him, did you get an impression about the friend and his involvement?

27

"[FORMER INMATE]:  I wasn't trying to form an impression about the friend.  The only impression that I got, or can say that I had, would be that he did not shoot the victims.  I was listening to him, and just—he didn't really speak about the friend so much.

"[PROSECUTOR]:  And so when [defense counsel] talks to you about him identifying this person as a witness, did he say those words, that he was a witness, or did he say he was a friend that was with me, and you're articulating he was a witness because he didn't shoot?

"[¶] . . . [¶]

"[FORMER INMATE]:  I would—the conversation took place three, four years ago.  I don't—I can't recall if he actually used the word 'witness,' or if this is a word that I just used.  Because he did not shoot, in my mind, that makes him witnessing it, so he would be a witness.

"[PROSECUTOR]:  And that's what I'm getting at.  Are you saying that because he was there, the friend, according to this person that you talked to, and because he didn't shoot, that, in your mind, he's a witness?

"[FORMER INMATE]:  Correct?

"[¶] . . . [¶]

"[PROSECUTOR]:  But you're not inferring anything additional to that, right?  Like there was no involvement on behalf of the other person; right?"

After sustaining defense counsel's objection to the phrasing of this question, the court asked:

"THE COURT:   . . . The question is whether or not this individual that talked to you inferred something other than him being a witness. That's the question.

"THE WITNESS:  Just that he was there.  I mean, he didn't pull the trigger.  That's all he was saying.  That he, himself, pulled the trigger on both of them."

28

Ruvalcaba contends defense counsel provided ineffective assistance by failing to elicit favorable trial testimony comparable to the inmate's favorable hearing testimony that Vincent claimed sole responsibility for the killings and the friend who was with him had no involvement in the killings. However, based on the questioning detailed above, it appears defense counsel tried to elicit comparable testimony, but simply was not successful. Defense counsel's lack of success appears attributable to the inmate's refreshing of his recollection between the hearing and trial. Because the inmate readily acknowledged during the hearing he did not have an accurate recollection of his conversation with Vincent, defense counsel was not able to impeach the inmate with his hearing testimony. Nevertheless, defense counsel was able to elicit testimony from one of the investigators who interviewed the inmate. The investigator testified that the inmate told him Vincent said another Hispanic male was with Vincent during the killings, but only as a witness. Accordingly, the record does not show defense counsel's failure to elicit the desired testimony resulted from objectively deficient performance.

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.