Filed 7/30/21  P. v. Perkins CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>BRANDON PERKINS et al.,<br><br>　　　Defendants and Appellants. | B302370<br><br>(Los Angeles County<br>Super. Ct. No. GA099146) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Carter, Judge.  Affirmed in part, reversed in part, and remanded.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant Brandon Perkins.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Laquan Donte Parker.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Stacy Shwartz and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

A trial jury found defendants and appellants Brandon Perkins (defendant Perkins) and Laquan Parker (defendant Parker) guilty of murdering Phillip Niles (Niles) and related offenses. On appeal from the judgment of conviction, defendant Parker argues (1) there was insufficient evidence to establish Niles's killing was murder because defendant Parker acted in self-defense or in the heat of passion, and (2) the court erred by not instructing the jury on how provocation may influence its determination of the degree of murder. Defendant Perkins advances a considerably greater number of contentions: (1) the trial court should have granted his motion for new trial arguing insufficient evidence supports his murder conviction on an aiding and abetting theory, (2) the court erred by not instructing the jury on all elements of alleged firearm enhancements, (3) insufficient evidence supports his conviction for being an accessory after the fact, (4) his convictions for murder and accessory after the fact cannot both stand, (5) his felon in possession of a firearm conviction should be vacated because no evidence established he sustained a prior felony conviction, and (6) fines and fees stricken by the court at sentencing but nevertheless included in his abstract of judgment must be deleted. The last two of these arguments have merit, but we will otherwise affirm.

## I. BACKGROUND

Count one of the criminal information against defendants charged them with murder in violation of Penal Code section 187,

3

subdivision (a).[1]  The information alleged, in connection with this murder charge, that both defendants personally and intentionally used and discharged a handgun causing great bodily injury and death to Niles (§ 10222.53, subds. (b)-(d)).  Counts two and three charged defendant Parker and defendant Perkins, respectively, with possession of a firearm by a felon in violation of section 29800, subdivision (a)(1).  Count four charged both defendants with carrying a stolen loaded firearm pursuant to section 25850.  Count five charged defendant Perkins alone of being an accessory to a felony after the fact.  A summary of the evidence presented at trial on these charges follows.

### A.     The Prosecution's Case
#### 1.     Events at the Argyle Club and the afterparty

Two women in the adult entertainment industry, Daniela Love (Love) and Dezerae Lyons (Lyons), communicated via Twitter on or around June 24, 2016.  Lyons, who had recently arrived in Los Angeles, was in a relationship with defendant Parker, who she knew at times carried a handgun.  Defendant Parker planned to go to a strip club with defendant Perkins, who was a friend, to celebrate his birthday.  Lyons was jealous, so she made plans to go the Argyle Club in West Hollywood (Argyle) with Love.

Cristina Ruiz (Ruiz) and her friend Nicholas Tucker (Tucker) also went to the Argyle in the evening on June 24, 2016.  The two entered the club with a group of others, including victim

_____

[1]     Undesignated statutory references that follow are to the Penal Code.

4

Niles, around 10:30 or 11:00 p.m.  Niles and Tucker obtained a table, and the group began drinking and dancing.

Love and Lyons arrived at the Argyle at around 11:00 p.m. They were drinking at a VIP table when they met some other people, including Niles.  When the Argyle closed around 2:00 a.m., Lyons and Love drove with Niles and his friends to an apartment complex in Glendale to continue the party.  Lyons and Niles were making out in the backseat.

After entering an apartment at the complex, some in the group smoked marijuana and Niles, Love, Lyons, and Ruiz used cocaine.  Niles and Lyons went into another room and were "intimate," but Lyons maintained they did not have sexual intercourse.

At some point after Niles and Lyons rejoined the group of others in the apartment, someone asked Love what she and Lyons did for a living.  Lyons disclosed they were in the pornography industry and began talking about her work.  Niles reacted poorly, calling Lyons a whore and a slut, among other names.

While Lyons and Niles argued, Lyons pulled out her phone and called defendant Parker.[2]  She was on the phone with him for approximately twenty minutes.  Niles kept calling Lyons names while she was on the phone.  Lyons told the group she wanted to leave and that her boyfriend was coming to pick her up.  She also told Love she wanted Love to come with her because it was not safe to leave her there alone.

---

[2]  Ruiz recalled Lyons saying she was speaking to her "pimp daddy" or "sugar daddy" and telling Niles she was going to get him to come blast Niles with a gun.

Defendant Parker called Lyons and told her to go to the front of the apartment complex.  He sounded calm on the phone.  Love and Lyons left the apartment, and Niles followed them out.  Lyons told Niles to go back inside.  Niles did not; he followed Love and Lyons and kept talking.

> ### 2. *Love's account of the shooting and the aftermath*

As they walked, Lyons saw her car that defendant Parker had driven to the location (which was unoccupied when she saw it) and Love got in the car's backseat.  Niles had calmed down some, but he was still aggravated.  While Love was sitting in the car, she saw defendants run up from behind the car; defendant Parker had a gun in his hand.  Defendants walked toward Niles and he backed away, though he was still being aggressive.  Niles, who appeared intoxicated, asked defendants what they were going to do and dared them to shoot him.

Shortly after Love heard Niles tell defendant Parker to shoot him, Love saw three flashes.  Defendants and Lyons then got in the car and drove away.  After the car moved five or ten feet, Love saw and heard two or three more gunshots come from the left side of the car.  The front left window was down at the time.  Love estimated a minute passed between when she saw and heard the first shots to when she heard the second group of shots.  When Love last saw Niles, he was backing up and seemed scared.  She did not see him get shot.

In the car, defendants were talking to each other, saying things like "did you see how fast he dropped?"  They also listened to a song about murdering people while on the way to a motel where Lyons was staying, and Lyons saw defendant Perkins

swinging around a bag of bullets. Neither defendant seemed scared. Love asked to go home, Lyons asked if they could drop her off, and defendant Parker told her to shut up.

Once back at the motel, Love again asked to go home, but defendants kept saying no. At one point, Love was left alone with defendant Perkins while Lyons and defendant Parker left to get food. Defendant Perkins showed Love a gun he had, which was silver. Eventually, Lyons called Love an Uber and she was allowed to leave.

### 3. *Lyons's account of the shooting and the aftermath*

After Lyons, Love, and Niles reached the front of the apartment complex, Lyons and Love got in Lyons's car. Lyons then saw defendants approach, and they appeared to have come from behind some bushes. Both defendants were wearing ski-type masks and holding guns. Niles was outside Lyons's car near the driver's side window, and he appeared confused when defendants appeared.

Defendant Parker and Niles argued. Niles was loud and drunk and asked defendant Parker what was happening. Niles appeared to be trying to put his feet into a martial arts stance, but he was so drunk he looked goofy and looked like he was dancing. Defendant Parker did not react until a punch from Niles connected with his forehead. The punch was "sloppy" and looked weak. Niles and defendant Parker then exchanged racial epithets and defendant Parker—who by that point had pulled a gun—fired a warning shot into the sky. Niles appeared shocked.

Niles then taunted defendant Parker that he would not shoot him (Niles) with the gun. Defendant Parker responded by

7

briefly pointing his gun at Niles.  Then, when Niles put four fingers into a pocket, leaving his thumb out, defendant Parker shot him.  Throughout the interaction, defendant Perkins did not attack Niles or say anything to him.

After the shooting, defendants quickly got into the car with Lyons and Love.  At some point, one of the defendants started playing a song about murder.  Defendant Parker was initially tense but relaxed after fifteen to twenty minutes.  He kept telling Lyons and Love to shut up.  Defendants did not say anything about shooting Niles, and Lyons did not hear any more gunshots as Parker drove away.

### 4.    *Other witnesses*

Errol Lopez, who was present in the area at the time Niles was shot, saw two men walking away from a nearby apartment complex.  Lopez heard noises that sounded like a struggle or conflict, he heard someone say "shoot it," and he then heard three to four gunshots.

Christopher Solomon heard two loud bangs around 4:00 a.m.  He looked out his window and saw a car driving south, and he then saw two bright flashes from the passenger side of the car.

John Dalbo called 911 and reported he heard approximately six gunshots in the area where the shooting occurred in Glendale.

### 5.    *The police response and investigation*

Glendale police officers responded to a shots fired call in the area of the apartment complex.  An officer (also trained as a

paramedic) rendered aid to Niles and then pronounced him dead at the scene.

Officers also found two groups of ammunition shell casings. There was one group of four, and another group of two casings about 200 feet away from the first group. Officers also identified what appeared to be a trail of blood droplets between the location of the casings and the location of Niles's body.

Later in the day after the shooting, defendant Parker drove Lyons to an appointment. Lyons brought up a Glendale news report of Niles's death. Defendant Parker told Lyons he shot Niles but did not know he was dead until hearing the news. Later, Love informed Lyons that she should be careful because police had visited her (Love's) home in connection with Niles's death. Lyons then made defendants aware of the police activity, and defendant Parker told Lyons she was probably not going to see him for a while.

In the meantime, Officer Jose Barajas of the Glendale Police Department had set up surveillance at the motel where defendants and Lyons were staying. A short time after Lyons told defendants that the police had been at Love's house, Officer Barajas saw Lyons and defendants rushing down the motel stairs—carrying bags—to where their cars were parked. Defendant Perkins put items in one car while defendant Parker and Lyons put things in the other car. Officer Barajas subsequently saw the trunk of one of the cars open and defendant Parker moving things from one car to the other.

Shortly thereafter, the police arrested defendants. A forensic specialist found a black Glock handgun (later determined to be the murder weapon), a silver Beretta 92 FS handgun, and a

1911 Para Ordnance handgun in one of the cars defendants had loaded with items.

Defendants were interviewed separately by the police. Perkins denied knowing about the murder and claimed he was not present when the shooting occurred. He said he had purchased a gun that morning and admitted one of the handguns found by the police was his. He declined to explain where he bought the gun, however. When shown a photo of the Glock handgun recovered by police, defendant Perkins said it did not belong to him. Defendant Parker, for his part, denied knowing Niles but admitted he picked up Lyons from a party somewhere.

Lyons was interviewed by the police and initially tried to protect defendant Parker. She did so because she was confused and still wanted to be his girlfriend at the time. Though Lyons lied to the police at first, she later decided to be truthful.

The Glendale Police Department's crime laboratory analyzed swabs of evidence for the presence of DNA. DNA that was a probabilistic match to defendant Parker was found on the trigger of the Glock; other components of the Glock had DNA matching both defendant Parker and Lyons. DNA that was a probabilistic match to defendant Perkins was found on the grip and trigger of the Beretta handgun the police recovered. A forensic specialist determined the group of four bullet casings were fired from the Glock handgun. The group of two bullet casings found approximately 200 feet away were fired by the Beretta.

The coroner determined Niles died of homicide by multiple gunshot wounds to the chest, which would have caused massive blood loss. The autopsy of Niles revealed his blood alcohol

content was .24 and there were cocaine and marijuana metabolites in his system.

B.    *Defendant Perkins's Defense Case*

Defendant Perkins called several witnesses during his defense case at trial, but he did not testify himself.

Heather Mutize (Mutize) was a resident of the apartment complex where the afterparty was held.  She was returning home between 3:00 a.m. and 4:00 a.m. on June 25, 2016, when she encountered defendants.  One of them told her they were waiting for a friend or friends to come out of the building.  Defendant Parker was on his phone most of the time, and Mutize primarily spoke with defendant Perkins.  They were both pleasant (and not wearing masks), and Mutize did not see any weapons.  Mutize and defendants were unable to gain access to the complex and went their separate ways.  Later, when she was looking at her phone while still in the area, Mutize saw someone running up the opposite side of the street.  Shortly thereafter, she heard what she thought were firecrackers and a vehicle drive away.

Defense investigator Ronald Cross spoke to Lyons by phone in May 2017.[3]  Lyons told Cross she had intercourse and oral sex with Niles.  She also said they had smoked marijuana and used some methamphetamine or cocaine.  She said she had never seen defendant Perkins with a gun that night and did not know he had one until later.

Forensic scientist William Moore opined there were two shooting scenes.  He agreed the four bullet casings were from a Glock, and the other group of two were from a Beretta.  He

---

[3]    Lyons denied ever speaking to Cross.

11

opined the Beretta cartridges were discharged outside what he called the primary shooting area.

C.    *Defendant Parker's Defense Case*

Defendant Parker testified in his own defense at trial.[4]  He told the jury he came to Los Angeles about two weeks before the murder because Lyons, his girlfriend at the time, had a shoot in Los Angeles.

The day after defendant Perkins arrived, defendants were going to go to Hollywood Boulevard.  Lyons was going to go out separately.  Defendants went out as planned and returned to the motel around 3:00 a.m.  Lyons was not there.  The battery in defendant Parker's phone had died by that point.  When he charged it enough to turn it on, he found text messages from Lyons describing her movements, including one saying she needed a ride and was being kidnapped.  Defendant Parker called Lyons, who told him she was at a party and needed to be picked up.  He heard loud talking in the background but did not hear any specific words.  Lyons sent defendant Parker the address where she was, and defendants drove to that location.  Defendant Parker owns a Glock, which he carried for self-protection, and he knew defendant Perkins also had a gun.

When defendants arrived at the address Lyons gave them, defendant Parker sent Lyons a message saying he had arrived.  She was not there, so he got out of the car to find a way into the apartment complex.  The gate he tried to enter was locked.  Defendant Parker encountered a woman who said they might be

---

[4]    Defendant Parker had two prior felony convictions, one for evading arrest and one for possessing a firearm.

12

able to get in down the street, but that gate was locked too. Defendants walked back toward their car, and as they were walking, defendant Parker saw Lyons and Love walk out, with a man following a few seconds behind. Defendant Parker was not wearing a mask.

Lyons, Love, and Niles were standing outside of the car when defendant Parker approached. They were arguing, with Niles calling the women hoes, hood rats, and bitches, and the women yelling back at him. Defendant Parker asked Niles what was going on, and Niles turned toward him. Niles started screaming at defendant Parker and used obscenities and racial epithets. The women got into the car at some point, but defendant Perkins remained outside.

Niles then charged at defendant Parker, throwing punches, and continued to scream obscenities and racial epithets. The racist comments made defendant Parker angry and offended him. Defendant Parker, whose gun was still in his waistband, hopped to the left to avoid Niles's punches, but Niles kept coming. Niles hit defendant Parker in the face two or three times and the altercation escalated to the point where defendant Parker pulled out his gun, pointed it in the air, told Niles to leave him alone, and fired a shot into the air. Niles challenged defendant Parker, resuming his use of racial epithets and saying, "You better use that fucking gun. I'll take it from you and fuck you up."

Defendant Parker thought that if Niles got his gun, Niles would shoot him. He professed to have been in fear for his own safety by that point. As defendant Parker described it when testifying, "[Niles] hit me two or three times; and then he charged

13

me again, which caused me to shoot." Defendant Parker then fired his gun three additional times.[5]

Niles ran off in the opposite direction after the shots were fired and defendant Parker ran to the car. Defendant Parker drove away and, as he did so, grabbed the Beretta belonging to defendant Perkins and fired two shots into the air. He did so because he did not know where Niles went or what he had on him and wanted him to keep running. Defendant Parker did not know whether the bullets he fired hit Niles, and he first learned Niles had died when the police told him. At the time of defendant Parker's arrest, he was transferring bags from one car to the other because his cousin had invited him to a pool party and he planned to drive to it with defendant Perkins.

> D. *Closing Argument, Jury Instructions, and Post-Trial Motions*
> 1. *The prosecution's closing argument*

During closing argument, the prosecution argued defendant Perkins was guilty of second degree murder on a theory of aiding and abetting defendant Parker. On the issue of intent, the prosecution argued defendant Perkins saw defendant Parker aim the gun and shoot Niles three times, that defendant Perkins knew exactly what defendant Parker was doing, and that defendant Perkins knew defendant Parker had the intent to kill Niles. The prosecution further argued defendant Perkins intended to aid defendant Parker because defendant Perkins fired his Beretta as they were driving in the direction Niles fled.

---

[5] Defendant Parker testified he had previously put only four bullets in the gun.

As the prosecution theorized, defendant Perkins did not know Niles was dead and defendant Perkins's shots helped defendant Parker complete the murder because they would deter or delay anyone from rendering emergency aid to Niles.

### 2. Jury instructions and verdicts

The trial court instructed the jury with CALCRIM No. 3149, which addresses personal discharge of a firearm causing injury or death under section 12022.53, subdivision (d). The instruction stated, in pertinent part, that if the jury found "a defendant" guilty of first or second degree murder, it was then required to decide whether the People had also proven the defendant personally and intentionally discharged a firearm "during that crime" causing death. The instruction further stated the People were required to prove, among other things, that "[t]he defendant" personally discharged a firearm during the commission of that crime.

The trial court additionally instructed the jury with CALCRIM No. 3146 regarding personal use of a firearm under section 12022.53, subdivision (b). That instruction, however, was limited to defendant Parker, and the jury was told to apply it only if it found defendant Parker guilty of voluntary manslaughter.

In addition to the aforementioned instructions, the court gave the jury instructions defining homicide, justifiable homicide by self-defense or defense of another, first or second degree murder with malice aforethought, first degree murder, voluntary manslaughter in the heat of passion, and voluntary manslaughter in imperfect self-defense or imperfect defense of

15

another.  It did not instruct the jury regarding the effect provocation can have on the degree of murder.

The jury found defendant Parker guilty of first degree murder.  The jury also found true allegations that defendant Parker personally used a handgun pursuant to section 12022.53, subdivision (b), that defendant Parker personally and intentionally discharged a handgun pursuant to section 12022.53, subdivision (c), and that defendant Parker personally and intentionally discharged a handgun, which proximately caused great bodily injury to Niles.  The jury also found defendant Parker guilty of count two, felon in possession of a firearm, and count four, carrying a loaded firearm.  It found not true allegations that the loaded firearm was stolen and defendant Parker knew it was stolen.

The jury found defendant Perkins not guilty of first degree murder but guilty of second degree murder.  The jury found true allegations that defendant Perkins personally used and intentionally discharged a firearm.  It found not true, however, the allegation that defendant Perkins personally and intentionally discharged a firearm and caused great bodily injury or death to Niles.  The jury also convicted defendant Perkins of being a felon in possession of a firearm and carrying a loaded firearm.  The jury found not true the allegation that the firearm was stolen and defendant Perkins had cause to believe it was stolen.  The jury further found defendant Perkins guilty of being an accessory after the fact to a felony.

### 3. *Defendant Perkins's motion for new trial*

Defendant Perkins filed a motion for new trial arguing the jury's verdict was contrary to the evidence at trial. The trial court denied the motion.

In denying the motion, the court found illogical defendant Parker's claim to have fired his own gun and then also fired defendant Perkins's gun. In the court's view, the evidence showed defendants, both with guns, stood on either side of Niles and this suggested both defendants were confronting Niles. The court reasoned defendant Perkins took a gun to the location and used the gun at some point. The court believed defendant Perkins was not an innocent bystander and concluded the jury could reasonably find defendant Perkins knew what was going on and was also upset about Niles's behavior toward Lyons. Firing the shots demonstrated defendant Perkins shared the same intent as defendant Parker and that he was aiding and abetting. The court also believed defendant Perkins's shots would have delayed the delivery of aid to Niles because bystanders would wait until the shooting was over.

The court also found it significant that defendant Perkins's shots were not random and the evidence demonstrated Niles did not die where he was first shot by defendant Parker. The court thought this was important because it made it more likely the shots were intended for Niles. The court itself believed, and thought a reasonable jury could find, the shots were intended for Niles, which was another way in which defendant Perkins aided and abetted the murder. The court concluded the murder verdict was not contrary to the law and facts because there was sufficient evidence defendant Perkins aided and abetted the murder.

17

*E.	Sentencing*

The trial court sentenced defendant Parker to 25 years to life for the first degree murder conviction.  It exercised its discretion to strike one gun use allegation under section 12022.53, subdivision (h) but sentenced defendant to an additional 20 years under section 12022.53, subdivision (c), making defendant Parker's sentence on the murder charge 45 years to life.  The court stayed execution of sentences for counts two and four pursuant to section 654.

The court sentenced defendant Perkins to 15 years to life for the second degree murder conviction.  The court exercised its discretion to strike the section 12022.53, subdivision (c) enhancement but imposed the 10-year enhancement pursuant to section 12022.53, subdivision (b).  The court sentenced defendant Perkins to a concurrent 16 months for being a felon in possession of a firearm and stayed the sentence for carrying a loaded firearm pursuant to section 654.  As to the restitution fine and assessments, the court found defendant Perkins had no ability to pay them, but his abstract of judgment nevertheless states the fine and assessments were imposed, not stricken.

## II.  DISCUSSION

Defendant Parker's challenges on appeal are unmeritorious.  There is substantial evidence—testimony from Lyons and defendant Parker himself—that Niles's killing was murder, not perfect self-defense or manslaughter due to imperfect self-defense or heat of passion.  Defendant Parker's instructional error arguments also fail because the trial court had no sua sponte duty to instruct the jury as to the effect of provocation on the degree of murder and because the record does not establish

the absence of a request for such an instruction constitutes ineffective assistance of counsel.

Most of defendant Perkins's arguments on appeal also lack merit. The trial court did not err in denying his motion for new trial because there is substantial evidence defendant Perkins aided and abetted defendant Parker by, among other things, firing his gun after defendant Parker shot Niles. As to the asserted instructional error concerning the firearm-related sentencing enhancements, the error was harmless in light of the strong indications that the jury determined defendant Perkins discharged his gun during the commission of the murder. Substantial evidence also supports defendant Perkins's conviction for being an accessory after the fact (evidence that defendants were attempting to conceal or dispose of the murder weapon after the shooting) and his accessory conviction and his murder conviction are not logically inconsistent.[6] Defendant Perkins is correct, on the other hand, that he did not admit he sustained a prior felony conviction and the trial court never held a trial to determine the same. Thus, his conviction for being a felon in possession of a firearm must be reversed. We will not remand for resentencing because the felon in possession of a firearm sentence was ordered to run concurrently, not consecutively; instead, we will order the abstract of judgment corrected to reflect the reversal of this one conviction and the trial court's decision to strike defendant Perkins's restitution fine and court assessments.

---

[6] Defendant Perkins's opening brief also purports to join in all favorable arguments advanced by defendant Parker. As we will explain, there aren't any.

19

*A.    Defendant Parker's Appeal*

        *1.    There is substantial evidence Niles's killing was murder*

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  Our review must presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.] . . . . [T]he relevant inquiry on appeal is whether, in light of all the evidence, '*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'  [Citation.]" (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.)

When undertaking a substantial evidence inquiry, "the testimony of a single witness that satisfies the standard is sufficient to uphold the finding" even if there is a significant amount of countervailing evidence.  (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052; see also Evid. Code, § 411 ["Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"]; *People v. Robertson* (1989) 48 Cal.3d 18, 44.)  And "[i]t is well settled that, under the prevailing standard of review for a sufficiency claim, we defer to the trier of fact's evaluation of credibility." (*People v. Richardson* (2008) 43 Cal.4th 959, 1030.)

> a.	*there is substantial evidence defendant Parker did not act in perfect or imperfect self-defense.*

Perfect and imperfect self-defense were among the defenses defendant Parker advanced at trial.  To prove murder, the People were obligated to prove beyond a reasonable doubt that defendant Parker did not act in self-defense.  (*People v. Rios* (2000) 23 Cal.4th 450, 454; *People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168 (*Rodarte*).)  By finding defendant guilty of first-degree murder, the jury necessarily found the prosecution had carried this burden.  Defendant Parker challenges the sufficiency of the evidence to support such a finding.

"The doctrine of self-defense embraces two types: perfect and imperfect."  (*Rodarte*, *supra*, 223 Cal.App.4th at 1168.)  For a killing to be justified as self-defense or defense of another, the defendant must actually and reasonably believe that he, she, or someone else is in imminent danger of death or great bodily harm.  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*).)  The defendant must also reasonably believe the immediate use of deadly force is necessary to defend against the danger and must use no more force than reasonably necessary.  (*People v. Clark* (1982) 130 Cal.App.3d 371, 380, disapproved on another ground by *People v. Blakeley* (2000) 23 Cal.4th 82, 92.)  Imperfect self-defense or imperfect defense of another applies when the defendant subjectively believes (1) he, she, or another is facing imminent death or great bodily injury, and (2) the immediate use of deadly force is necessary, but one or both of these beliefs is objectively unreasonable.  (*Humphrey*, *supra*, at 1082; *People v. Trujeque* (2015) 61 Cal.4th 227, 270-271.)

21

There is substantial evidence defendant Parker did not murder Niles in perfect self-defense. Love and Lyons's testimony at trial established Niles was visibly intoxicated when he encountered defendant Parker. Lyons further testified Niles was so intoxicated that when he first attempted to raise his fists and hit defendant Parker, he was tipping over. While she agreed Niles looked as though he were attempting to get into a martial arts stance, she also stated he was so drunk it was "goofy" and looked like he was dancing. Though by her account Niles eventually landed a punch, the punch was sloppy and looked weak. In addition, no testimony at trial, not even defendant Parker's, established that Niles had a weapon. Based on this testimony, reasonable jurors could have concluded any subjective belief defendant Parker was in imminent danger of being killed or suffering great bodily injury was unreasonable. Further, even if reasonable jurors agreed there was some need to defend, they could have concluded defendant Parker used more force than reasonably necessary by shooting at Niles, who was unarmed and so drunk he was falling over. (See, e.g., *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025 [to constitute lawful self-defense, the person claiming the need to defend can have used no more force than necessary to defend against the danger].)

Defendant Parker nonetheless contends the jury could not have concluded a reasonable person in his position would have been confident he could have stopped Niles's "racist assault" without shooting him. He argues a reasonable person would not have dismissed the possibility that Niles would, as he threatened, take defendant Parker's gun and use it against him. Defendant Parker also contends the jury could not have found he used more force than was necessary because he did not have the time or

means to discern whether he could have disabled Niles without shooting him (or because defendant Parker shot Niles in anger rather than in fear). These arguments are unpersuasive under the prevailing standard of review in light of Lyons's, and to a lesser extent, Love's testimony establishing that Niles was visibly, heavily intoxicated to the point that his attempts to appear threatening were largely ineffectual and even "goofy."[7]

Defendant Parker argues the same points he raises in connection with perfect self-defense establish there is no substantial evidence on which the jury could have relied to reject imperfect self-defense. Specifically, he argues there was evidence he was actually frightened by Niles and insufficient evidence he did not act from fear of death or great bodily injury to himself. Contrary to defendant Parker's assertions, a reasonable jury could have concluded beyond a reasonable doubt that defendant Parker did not actually believe Niles posed a threat of death or great bodily injury to him. Niles was visibly intoxicated and had difficulty maintaining his footing, no witnesses testified Niles was armed during the confrontation, defendant Perkins was also present and armed nearby (as defendant Parker knew), defendants did not appear afraid immediately after the shooting, and defendant's self-serving testimony that he was afraid during the altercation is not dispositive (*In re Christian S.* (1994) 7 Cal.4th 768, 783 ["[W]hether the defendant actually held the required belief is to be determined by the trier of fact based on all the relevant facts. It is not required to accept the defendant's bare assertion of such a fear"]).

---

[7] The jury also heard the medical examiner's testimony about Niles's .24 blood alcohol level.

> *b.    there was substantial evidence defendant*
> *Parker did not act in the heat of passion*

"A heat of passion theory of manslaughter has both an objective and a subjective component.  [Citations.]  [¶]  "'To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.'"'"  (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)  Legally sufficient provocation is that which "'causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation.'  [Citation.]  Further, the 'proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment.'"  (*People v. Nelson* (2016) 1 Cal.5th 513, 539 (*Nelson*).)  The facts and circumstances must be ""'sufficient to arouse the passions of the ordinarily reasonable man.'"'"  (*Ibid*.)  As for the subjective element of voluntary manslaughter based on provocation, the defendant "must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation."  (*Moye*, *supra*, at 550; *Nelson*, *supra*, at 539.)

Defendant Parker essentially argues a rational jury could not conclude an ordinary person in his circumstances would have been able to act "out of rational thought" rather than out of an unconsidered reaction.  In doing so, defendant Parker contends the language Niles used was extraordinarily inflammatory.  Even if we found this isolated assertion persuasive, there is still substantial evidence defendant Parker did not act in the heat of passion.

Indeed, defendant Parker's own testimony belies any assertion defendant Parker was under the actual influence of a

24

strong passion induced by the provocation. Defendant Parker testified Niles's language offended him and made him angry, but he did not attribute his act of shooting to that anger. Rather, when describing the sequence of events, he testified Niles's act of charging at him a second time "caused me to shoot." By his own description, then, it was not heat of passion caused by provocation that caused him to shoot but rather Niles's physical act of charging at him. There is accordingly substantial evidence defendant Parker did not kill Niles in the heat of passion.

> 2. *The trial court had no sua sponte duty to instruct on the effect of provocation on the degree of murder and the appellate record does not demonstrate counsel was constitutionally ineffective by not requesting the instruction*

"In criminal cases, even absent a request, the trial court must instruct on general principles of law relevant to the issues raised by the evidence." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085.) A court does not, however, have a duty to deliver a pinpoint instruction sua sponte. (*People v. Rogers* (2006) 39 Cal.4th 826, 878 (*Rogers*).)

Defendant Parker argues the trial court erred by failing to instruct the jury with CALCRIM 522, which addresses the effect of provocation on the degree of murder. He then contends that if the jury had been properly instructed, it would likely have found him guilty of second degree murder, not first degree murder.

CALCRIM No. 522 is a pinpoint instruction the court had no duty to deliver sua sponte. (See *Rogers*, *supra*, 39 Cal.4th at 878 [discussing CALJIC analogue to CALCRIM 522].) As a

result, the trial court did not err by not giving the instruction without a request.

Defendant Parker additionally argues that if the trial court had no sua sponte duty to instruct the jury with CALCRIM No. 522, his counsel was ineffective for failing to request the instruction. "When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different . . . . On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Decisions about which jury instructions to request is an inherently tactical choice to be made by counsel. (*People v. Padilla* (2002) 98 Cal.App.4th 127, 137.) Here, the trial court instructed the jury on general principles of law, including murder and premeditation and deliberation. Counsel could have reasonably concluded the instructions, which correctly stated the law, were adequate to address the issue of defendant's intent and defense counsel may have made a strategic decision to focus on

26

achieving a complete acquittal.  Furthermore, even if we were to assume trial counsel erred in failing to request a pinpoint instruction on the effect of provocation on the degree of murder, we would conclude defendant was not prejudiced by the assumed error.  As discussed *supra*, defendant's own testimony did not link any anger at Niles's language—the supposed provocation—to his act of shooting Niles.  There is thus no reasonable probability on this record that defendant Parker would have obtained a more favorable result had counsel requested a pinpoint instruction.

> B.      *Defendant Perkins's Appeal*
> 1.      *The trial court did not err by denying defendant Perkins's motion for new trial*

A trial court may grant a motion for new trial on the ground the verdict is contrary to the evidence.  (§ 1181, subd. (6).)  In ruling on a motion for new trial, the trial court weighs the evidence independently but is guided by a presumption in favor of the correctness of the verdict.  (*People v. Davis* (1995) 10 Cal.4th 463, 523-524.)  A trial court has broad discretion in ruling on a motion for new trial, and on appeal there is a strong presumption the trial court properly exercised that discretion.  (*Id*. at 524.)

Defendant Perkins contends the jury's verdict on the murder charge was contrary to law and evidence, and the trial court's denial of the motion for new trial was thus error.  Defendant Perkins's argument is founded on two premises, both necessary: (1) that the prosecution elected to link the aiding and abetting charge to defendant Perkins's act of firing his gun (and not his act of standing with defendant Parker during the

27

confrontation with Niles); and (2) the record lacks sufficient evidence Niles was alive when defendant Perkins fired his gun.

Putting aside the question of whether there is sufficient evidence of aiding and abetting *before* defendant Parker fired the fatal shots, there was ample evidence at trial that the jury could have relied on to conclude Niles was not dead at the time defendant Perkins fired the shots from the Beretta handgun. Lyons testified she saw Niles run away from defendants. Police officers investigating the scene discovered a trail of blood droplets leading from the location where defendant Parker shot Niles to the location at which Niles ultimately collapsed. The shell casings from the Beretta handgun were found in the direction Niles ran. Additionally, trial testimony established the second round of shots were discharged very soon after the first. Though the medical examiner testimony did not pinpoint Niles's exact time of death (there was instead the testimony about the police officer/paramedic who rendered aid to Niles and then pronounced him dead at the scene), there was still solid evidence Niles was alive after defendant Parker shot him. Defendant Perkins believes whether Niles was alive or dead when he fired his gun is a matter of speculation, but we conclude, as the trial court did, that the evidence was sufficient to allow a reasonable jury and the court to conclude the shots were fired while Niles was still alive, and thus before the murder was completed. That alone compels rejection of defendant Perkins's argument that the trial court erred in denying the motion for new trial.

28

## 2. *The failure to instruct on lesser included gun allegations was harmless*

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citations]." (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) The trial court therefore has a sua sponte duty to instruct the jury on the essential elements of each charged offense. (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) The court also has a duty to instruct the jury on the elements of a sentence enhancement allegation.[8] (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 325-326 (*Sengpadychith*).)

"An instructional error that improperly describes or omits an element of the crime from the jury's consideration is subject to the 'harmless error' standard of review set forth in *Chapman v. California* (1967) 386 U.S. 18, 24, [][ (*Chapman*),]" which requires reversal unless it "appears beyond a reasonable doubt that the instructional error did not contribute to the jury's verdict." (*People v. Lamas* (2007) 42 Cal.4th 516, 526.) Similarly, "a trial court's failure to instruct the jury on an element of a sentence enhancement provision (other than one based on a prior conviction), is federal constitutional error if the provision 'increases the penalty for [the underlying] crime beyond the

---

[8]    Trial courts do not, however, have a sua sponte duty to instruct on lesser included enhancements that are not alleged in the information. (*People v. Majors* (1998) 18 Cal.4th 385, 411.)

prescribed statutory maximum.' [Citation.] Such error is reversible under *Chapman* . . . , unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict." (*Sengpadychith, supra*, 26 Cal.4th at 326.)

The trial court instructed the jury using CALCRIM No. 3149, which covers section 12022.53, subdivision (d). It did not, however, instruct the jury on subdivisions (b) (use of a firearm) or (c) (discharge of a firearm) of the same statute. The People concede this was error but argue it was harmless beyond a reasonable doubt. That is correct.

Although defendant believes the error was not harmless because there was evidence the jurors could have credited to support the inference defendant Perkins did not use or display his gun during the initial confrontation with Niles and that defendant Perkins's act of firing his gun occurred after the murder had been committed, defendant Perkins himself recognizes that the prosecution's theory of the case was that defendant Perkins aided and abetted defendant Parker by shooting his gun out of the car at the scene. The jury convicted defendant Perkins of second degree murder based on that aiding and abetting theory. In doing so, the jury necessarily found defendant Perkins had used and discharged his gun during the commission of the murder. Additionally, the evidence of the short timeframe between the two groups of gunshots, and the evidence that Niles was not instantly killed by defendant Parker's shots, further demonstrates defendant Perkins discharged his gun during the commission of the offense. We can therefore say beyond a reasonable doubt that the jury would have returned true findings on the special allegations under section

30

12022.53 subdivisions (b) and (c) even if it had been properly instructed.

### 3. *Substantial evidence supports defendant Perkins's conviction for accessory after the fact*

"The crime of accessory consists of the following elements: (1) someone other than the accused, that is, a principal, must have committed a specific, completed felony; (2) the accused must have harbored, concealed, or aided the principal; (3) with knowledge that the principal committed the felony or has been charged or convicted of the felony; and (4) with the intent that the principal avoid or escape from arrest, trial, conviction, or punishment." (*People v. Plengsangtip* (2007) 148 Cal.App.4th 825, 836 (*Plengsangtip*); accord, *People v. Tran* (2013) 215 Cal.App.4th 1207, 1219, fn. 7 (*Tran*).) As section 32 states, an accessory must know he or she is assisting a felon or one who has been charged with or convicted of a felony. (*Tran*, *supra*, at 1219.) The effect of an accessory's actions is "to lessen the chance that the perpetrators will be captured and held accountable for their crimes." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1168.)

Substantial evidence supports defendant Perkins's conviction for being an accessory after the fact. There is good evidence defendant Parker murdered Niles and, by the time they were moving their possessions from the motel, defendant Perkins knew defendant Parker had killed Niles. When Love warned Lyons that the police were investigating and she shared that information with both defendants, defendant Parker told Lyons she would probably not see him for a while. Both defendants returned to their motel rooms, obtained belongings, and then rushed to their cars.

Defendant Perkins nonetheless argues insufficient evidence supports the accessory after the fact conviction because there was no evidence he aided defendant Parker by moving the gun from one car to the other or by driving the car with the guns away to get rid of them. While it appears from the evidence that defendant Parker was the one who moved items between the two cars, the evidence also indicates defendant Perkins was a willing participant in that activity. In other words, although defendant Perkins did not affirmatively do the moving of the items, the jury could reasonably infer he permitted defendant Parker to do so in order to transport the murder weapon—since he did not immediately drive away after first getting into the car. That is sufficient to support the conviction for accessory after the fact.

> ### 4. *Defendant Perkins was properly convicted as both a principal and an accessory*

A defendant may be convicted as both a principal and an accessory where the convictions depend on entirely different conduct. (*People v. Riley* (1993) 20 Cal.App.4th 1808, 1814-1815 [affirming convictions of murder and accessory to murder].) Defendant Perkins contends his conviction for accessory after the fact cannot stand because it was based, in part, on the same conduct for which he was convicted of murder.

Here, defendant Perkins's convictions for murder and accessory after the fact rested on different acts. Defendant Perkins's act of shooting his gun out the car window toward Niles is a primary act upon which the jury could find him guilty of murder. His conviction for being an accessory after the fact, on the other hand, is supported by the aforementioned evidence that he waited to permit defendant Parker to transfer possessions,

including the gun defendant Parker used to murder Niles, into defendant Perkins's new car rather than driving away immediately. While there is some overlap between the evidence supporting the two offenses—the prosecution argued at trial that the defendants' act of moving possessions between the cars demonstrated consciousness of guilt for the murder—the primary acts underlying the two convictions are nevertheless different. As a result, both may stand.[9]

>    5.    *The conviction for being a felon in possession of a firearm must be reversed*

"Any person who has been convicted of a felony under the laws of the United States, the State of California . . . and who

---

[9]    *In re Eduardo M.* (2006) 140 Cal.App.4th 1351, 1357-1360 (*Eduardo M.*) and *In re Malcom M.* (2007) 147 Cal.App.4th 157, 169 (*Malcom M.*) do not compel a different result. *Eduardo M.* held the defendant in that case could not be convicted as both principal and accessory solely on the basis of his immediate flight from the scene of the crime and subsequent denial of involvement, even if that incidentally helped a coprincipal escape. (*Eduardo M.*, *supra*, at 1357.) Here, defendant Perkins's accessory liability was not based on defendants' immediate flight from the scene of the murder, but on their attempt to move or hide the murder weapon many hours later. The court in *Malcom M.* held "that, in order to find someone to be an accessory after the fact to a felony in the commission of which the person is also a principal by virtue of his or her having aided and abetted its commission, the acts constituting that felony must have ceased at the time of the conduct that violates section 32." (*Malcolm M.*, *supra*, at 157.) Here, there is no question the murder was completed by the time the acts comprising defendant Perkins's accessory liability were performed.

33

owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." (§ 29800, subd. (a)(1).) "The elements of this offense are conviction of a felony and ownership or knowing possession, custody, or control of a firearm." (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052.)

It is undisputed the trial court bifurcated the issue of defendant Perkins's prior felony convictions, did not instruct the jury on the prior felony element of this crime, and then failed to hold a trial on the prior felonies. The People concede the record contains no admission or stipulation from defendant Perkins and no trial proceedings or findings regarding his prior felonies. They further concede this requires reversal and that they are prohibited from retrying this count. We agree, accept the concession, and will reverse defendant Perkins's felon in possession conviction.

6. *The abstract of judgment and minute order must be modified to strike the restitution fine and assessments*

The trial court recognized it must impose a restitution fine, a court operations assessment, and a court security assessment on defendant Perkins. At the same hearing, however, the court found defendant Perkins had no ability to pay these financial obligations and struck them.

Despite this ruling, the minute order for the hearing states the fines and fees were only stayed and the abstract of judgment reflects that they were imposed. Defendant Perkins argues the abstract of judgment and minute order must be corrected to reflect the trial court's oral pronouncement. The People concede

34

the abstract of judgment must be corrected but do not address the minute order.

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls. [Citations.]" (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Because the trial court struck the fine and assessments after determining defendant Perkins lacked the ability to pay, the abstract of judgment and minute order must be modified to reflect the court's oral pronouncement.

DISPOSITION

Defendant Parker's judgment is affirmed. Defendant Perkins's conviction on count three, possession of a firearm in violation of section 29800, subdivision (a)(1) is reversed, and the remainder of the judgment is affirmed. The trial court is directed to prepare a corrected sentencing minute order and abstract of judgment eliminating the conviction on count three and striking the restitution fine and court assessments to conform to the court's oral pronouncement. The trial court shall forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


RUBIN, P. J.


MOOR, J.